ALBERT JACKOVACH, Appellant, v. A. L. YOCOM, Jr., Appellee.
No. 40749.

JUNE 20, 1931.

Mabry & Mabry, for appellant.

Dutcher, Walker & Ries and George C. Stuart, for appellee.

GRIMM, J.—On the 21st day of March, 1929, the plaintiff, Albert Jackovach, by his father and next friend, brought a suit at law in the District Court of Lucas County, Iowa, for the April, 1929, term of the District Court, asking damages for $15,000.00.

It appears that on the 10th day of March, 1929, plaintiff, then a boy of about seventeen years of age, living with his parents at Williamson, a mining town in Lucas County, Iowa, in company with a young man of about the same age, boarded a freight train at Williamson to ride the same to Chariton, some eight or ten miles away. As the freight train approached Chariton, it became apparent it was not going to stop and thereupon both boys arranged to jump off the train as it passed through Chariton at a rate of speed variously estimated at from fifteen to thirty-five miles per hour.

William Wood, the plaintiff's associate, jumped first.

Apparently the boys were riding oil tank cars and as the plaintiff jumped off, he left the car upon which he had been riding in such a way as that an iron step on the car immediately behind the car upon which the plaintiff was riding struck the plaintiff on the head.

In attempting to save himself as he fell to the ground, he lit on one of his hands. This was between two parallel tracks, the space between which was filled with cinders. The plaintiff was either dragged or rolled, and the evidence does not very clearly show which, a considerable distance, possibly fifty to eighty feet.

When he jumped, he had on an overcoat, undercoat, shirt and a long-sleeved undershirt.

A disinterested witness described his condition as follows:

"When picked up, his overcoat was pretty badly shredded, his hat was gone, his face was all scratched and his hand dangled."

He was helped into the waiting room of the station and the defendant, Dr. Yocom, was immediately called and responded at once.

The boy was taken to a hospital, known as the Yocom Hospital and operated by the defendant.

On examination, it was found that he had a long scalp wound, two or three inches in length, from which he was bleeding profusely. It was discovered that he had a crushed elbow joint, there being what is known as a compound, comminuted fracture thereof.

After an examination, the boy was removed to the operating room of the hospital, two other physicians were called, an anaesthetic administered and the wound on the head was treated by stopping the flow of blood and sewing up the cut. After a consultation of the doctors, the arm was amputated.

This suit is brought on the theory that the defendant was employed and instructed to "reduce and mend" the said fractured arm and not to amputate the arm and that the amputation was without the express consent of the plaintiff or of his parents. The cause was tried to a jury, all of the issues having been withdrawn from the consideration of the jury except the charge that the amputation was performed without the consent of the plaintiff or his parents. The jury returned a verdict for the defendant, and the plaintiff appeals.

I. The appellant contends that the lower court erred in not granting a change of venue upon the plaintiff's application.

As has been stated, the petition was filed on the 21st day of March, 1929, for the April, 1929, term of court. The defendant made an appearance at the April, 1929, term of court and upon request of defendants' attorneys the time for answer was extended until the 11th day of April, 1929, on which day an answer was filed. By that time, the condition of the trial

work at that term of court was such that it became necessary to continue the cause over the April term.

On the 20th day of August, 1929, the plaintiff filed a Motion for Change of Venue, the substance of which is that the defendant had for many years been a leading physician and surgeon of Lucas County where he had practiced for many years and that his influence extended throughout the county, that he had patients from all parts of the county, that he was connected with various lodges and organizations and that plaintiff could not obtain a fair and impartial trial in said Lucas County for the trial of his cause. It is also alleged that the attorneys of Lucas County would exercise their influence in behalf of the defendant.

In the affidavits in support of the motion, it is claimed that the plaintiffs were unable to secure legal assistance at Chariton, the county seat of Lucas County. Affidavits of several residents of Lucas County were filed in support of the motion. A Resistance was filed, objecting to the change upon the grounds, among others, that the application came too late, it having been filed after a continuance and denying the claims of prejudice.

There is a showing by a half-dozen or more attorneys living in Chariton to the effect that they had not been employed and that no attempt had been made to employ them in the plaintiff's behalf.

The court overruled the motion.

Section 11414 of the Code of 1927 is as follows:

"11414. Application for change. The application for a change of place of trial may be made either to the court or to the judge in vacation, and if made in term time shall not be awarded until the issues are made up, unless the objection is to the court, nor shall such application be allowed after a continuance, except for a cause not known to the affiant before or arising since such continuance, and after one change no party is entitled to another for any cause in existence when the first was obtained."

The fact of the long residence of the defendant in Lucas County, his occupation as a physician and surgeon, and the other statements were matters of common knowledge or easily ascertained at or before the time of the continuance. There is

nowhere in the application for a change of venue any claim or proof that the grounds for the requested change were not known to the affiant before the continuance or that they arose since such continuance, as provided in the statute.

There is a claim in the application for a change to the effect that it was impossible for the plaintiff to procure legal assistance in the county. This charge is abundantly met by counter-affidavits of practically all, if not all, of the attorneys of that county.

Upon the whole record in reference to a change of venue, we think the lower court correctly ruled.

II. It is next argued by the appellant that the court committed prejudicial and reversible error in relation to the admission of testimony and the instructions concerning X-ray pictures taken of the amputated stump of the arm. These X-ray pictures were taken by one Dr. Gutch several days after the amputation. The father of the plaintiff secured the amputated member from the defendant and afterwards carried it to Dr. Gutch who made the X-ray pictures thereof.

It appears, without contradiction, that before the amputated member had been turned over to the plaintiff's father, and while the member was still pliable, the defendant had ''put the bones back in shape''. He had ''moulded up the arm'', and thereafter stiffness set in. In other words, the X-rayed member was in an entirely different condition when X-rayed than it was at the time the defendant and his associates examined the member before the amputation, and it was in an entirely different condition from that in which it was immediately after the amputation. Moreover, the pictures were not excluded.

The court instructed the jury in relation to said exhibits, as follows:

''There is no evidence that the condition of plaintiff's arm or the relation of the bones to each other as shown by said pictures were the same at the time the defendant was treating the plaintiff as at the time said pictures were taken.''

The court further instructed the jury that the said pictures were to be considered only ''as evidence of the condition of plaintiff's arm and the situation of the bones therein at the time said pictures were taken.''

There was no error in this instruction. The jury had the benefit of the pictures for what they were worth. It being undisputed, it was entirely proper for the court to call the attention of the jury to the fact that the arm was not in the same condition when the pictures were taken as when the defendant diagnosed the case and performed the operation. The record conclusively shows that at the time of the diagnosis and the operation, the elbow joint was very severely mangled, a portion of the fractured bone protruded through the flesh, the broken fragments of the bones in and about the elbow joint were separated and as widely scattered as the crushed and mangled flesh would permit. After the amputation, these scattered fragments were "moulded up" and pressed together, after which normal stiffness which followed the death of the member set in, making it an entirely different looking object when photographed than what it was at the time of the diagnosis and the amputation.

III. One of the complaints of the plaintiff is that the amputation was made without taking an X-ray of the arm prior thereto. The court withdrew this question from the jury, and rightly so. As was said in Snearly v. McCarthy, 180 Iowa 81:

"The purpose, of course, in using the X-ray is to diagnose the case, and if this may properly be done without the use of this modern appliance, then no negligence is to be inferred from failure to use one. Moreover, the record here shows that the nature of the fracture was discovered when defendant was first called; hence an X-ray examination would have added nothing."

This language is peculiarly applicable to the case at bar.

While the plaintiff and his young companion undertook in a most general way, as laymen, to describe the appearance of the arm before amputation, nevertheless, the expert testimony of the three physicians is that the mangled, crushed and shattered condition of the elbow of the arm was plainly apparent by sight and feeling, without the use of any X-ray device. Moreover, it is apparent that under the facts in this case, the opinion of the plaintiff and his young companion, based solely upon a mere casual examination of the outward appearances, though without even a close examination of the condition of the arm, raises no conflict as against the positive expert evidence of those skilled in the science of examining and determining conditions of the

character such as obtain in this case, who made careful examinations to ascertain the actual conditions.

The evidence of the plaintiff and his companion was offered upon the theory that a surgical operation was not necessary. It was offered in the face of the unanimous and uncontradicted testimony of the physicians, the defendant and another experienced physician who assisted in the operation, and still a third, who gave the anaesthetic and observed the arm generally, without giving it detailed close examination. Whether the arm should be amputated without first using an X-ray was not a question to be determined by the jury upon a record such as that. This court said, in Snearly v. McCarthy, 180 Iowa 81:

"As a general rule, it may be safely affirmed that, in matters requiring special skill and training, it is not permissible for laymen as nonexperts to set up any artificial standards as to methods of treatment. This is especially true in surgery; for in that field neither courts nor juries are presumed to know more regarding methods of treatment than ordinary laymen, and that is practically nothing. After hearing the theories, deductions and scientific facts from experts, both judge and jury must often oppose one set of opinions against another and determine which is the more reasonable, but they cannot, without some guide, presume to fix any standard upon which to determine the correctness of any kind of treatment. This is pointed out in many cases from other jurisdictions. Ewing v. Goode, 78 Fed. 442; Getchell v. Hill, 21 Minn. 464; Tefft v. Wilcox, 6 Kans. 46; Farrell v. Haze, (Mich.) 122 N. W. 197. We have adhered to that doctrine in Morrow v. National Mas. Acc. Assn., 125 Iowa 633."

No expert testified an X-ray was necessary. The opinions of the nonexperts under the facts in this case were not material. The court properly withdrew from the jury all claims based upon the failure of the defendant to use an X-ray before performing the amputation.

IV. It is contended that the question whether the arm should have been amputated should have been submitted to the jury. We think not. The undisputed evidence of the defendant and his assistants is that an operation was necessary. The question was one peculiarly within the domain of science. All the

professional witnesses agree that the amputation of the arm was within the usual and ordinary practice of the profession, at the time, in Chariton and similar communities and that the amputation was necessary to save the plaintiff's life. There is no testimony whatever that the operation was unskilled or negligently performed. There is no evidence whatever that there was no necessity for the operation. The experts agree that there was an emergency demanding activity.

Dr. Gutch, the plaintiff's witness, is not in any real dispute with the professional witnesses who testified on behalf of the defendant and he frankly admits that:

"Without the examination by the doctor a description of an arm that has suffered a fracture such as is shown in these plates Exhibits 4 and 5 given by a layman and particularly boys 16 and 17 years of age would not be considered reliable data on which medical men could make a diagnosis, and map out their procedure."

It is wholly impractical and unnecessary to quote at length from the testimony regarding the necessity for an amputation. We quote the following from the defendant's testimony:

"The periosteum is a membrane covering the bones of the human body. Its object is to furnish the blood supply to the bone and the periosteum of the bones in this joint, the radius and ulna and humerus were destroyed and when this happens the blood supply is destroyed and you have no opportunity for new bone formation, there is no possibility of a broken bone mending itself. I knew the periosteum was destroyed by examination. There were very many pieces of this bone broken off and loose inside the arm and too many to enumerate. The effect of breaking bones into fragments, such as I have described, is to destroy or badly damage the soft parts. In this individual case the soft parts were lacerated all to pieces inside the arm and all those muscles and capsule of the joint and the periosteum. There was absolutely no opportunity in this case of adopting any method whereby these comminuted fragments of bone could have been put back in their approximately relative position and held there and healed. It could not have been done either by splints nor by opening up the arm and using a fixation of wire or catgut or anything of that kind and without putting these

fragments back into their approximately relative position there was no possibility of saving the lower part of the arm on account of the damage to the bones, capsule of the joint, muscles and circulation, and if an attempt had been made to put these fragments into position and hold them there the arm would have rotted off. The flesh and muscles were absolutely destroyed and mashed beyond comprehension. If a piece of the fascia remained in that arm and circulation not restored through it you would have had gangrene and unless gangrene is removed the patient dies.''

As was said in Cozine v. Moore, 159 Iowa 472:

''All experts agree that every difficult case presents a zone wherein the question of the best method becomes largely a question of judgment of the attending surgeon under all the apparent circumstances of such particular case.''

In Nelson v. Sandell, 202 Iowa 109, this court said:

''The physician is bound to bring to the service of his patient and apply to the case that degree of knowledge, skill, care, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances and in like localities. Smothers v. Hanks, 34 Iowa 286; Whitsell v. Hill, 101 Iowa 629; Ferrell v. Ellis, 129 Iowa 614; Haradon v. Sloan, 157 Iowa 608; O'Grady v. Cadwallader, 183 Iowa 178; Flanagan v. Smith, 197 Iowa 273; Furgason v. Bellaire, 197 Iowa 277. He does not impliedly guarantee results. Smothers v. Hanks, supra; Kline v. Nicholson, 151 Iowa 710. Whether the defendant exercised the degree of care and skill required of him cannot be determined from the testimony of laymen or non-experts, since it is only those learned in the profession who can say what should have been done, or that what was done ought not to have been done. Smothers v. Hanks, supra; Kline v. Nicholson, supra; Cozine v. Moore, 159 Iowa 472; Snearly v. McCarthy, 180 Iowa 81; Flanagan v. Smith, supra.''

No expert in this case testified that an amputation was not necessary or should not have been performed. It must indeed have been apparent to even an inexperienced layman that no other course was open.

Under the record in this case, there was no issue to submit

to the jury on the question of the advisability or necessity of an operation.

V. The appellant objects to the instruction of the trial court under which it submitted to the jury the question whether the operation was performed without the consent of the plaintiff and whether the defendant was warranted in performing the operation without the consent of the plaintiff or his parents.

The record shows that the plaintiff was born in Jugo-Slavia in 1912 and came to this country with his parents nine or ten years ago. He had five brothers and sisters. The family first went to Minnesota where they lived for two years. They then lived in Des Moines for two years where the plaintiff went to school. They afterwards lived in Tipperary, Iowa, in 1925. They went to Chicago from there where the boy worked in a can factory and for a paper company. He went to Williamson about Christmas time, 1928.

The plaintiff testified he knew when he was taken into the operating room of the hospital. He was asked:

"Q. What did you think he (the defendant) was going to do when he took you into the operating room? A. I thought he was going to fix it (the arm). Q. And you expected him to do whatever was necessary to fix it, didn't you? A. What was necessary. I don't know what was necessary."

The testimony shows that at the time the plaintiff was taken into the operating room and put under an anaesthetic he had a cut on the back of his head approximately $2\frac{1}{2}$ or 3 inches in length from which the patient was bleeding profusely. It was absolutely necessary to stop this flow of blood to save his life. Two other physicians were in attendance, one assisting directly in the operation and the other giving the necessary anaesthetic.

It clearly appears from the record that prior to the time the operation was begun, an effort was made by the defendant to get word to the parents of the plaintiff. They lived in another town some eight miles away and did not have a telephone. The father was at work, underground, in a coal mine and the mother was either not at home, or sick in bed, and the record does not very clearly show which. One or more telephone messages were sent to the little town of Williamson and

neither the father nor the mother could be found and they were not found for some little time after the operation was completed.

The defendant was confronted with the question whether he would release the plaintiff from the anaesthetic necessarily used in connection with stopping the flow of blood from the wound in the head and sewing up the wound and thereafter ascertain whether the plaintiff and his parents would consent to an amputation of the arm, or perform the amputation under the one anaesthetic. Necessarily, if an amputation were to be performed, it would involve the use of a second complete anaesthetic. This would greatly add to the shock suffered by the plaintiff.

The crushed and mangled condition of the arm was in itself a menace to the life of the patient. The expert medical opinion was that an emergency existed and an amputation was necessary. The defendant used his best judgment under all the facts and circumstances in the case.

When the young man was put upon the operating table, he expected the surgeon to "fix" his arm. He manifestly did not know what was necessary and so admitted in his testimony. There was here an implied consent to the amputation if, in the skilled judgment of the surgeon, the same was found to be necessary.

The surgeon had promptly ordered word sent to the parents and they could not be reached. The boy was bleeding profusely from the wound in the head. That must be stopped promptly. An anaesthetic was necessary for that purpose. The mangled condition of the arm presented to the experts not only an arm which could not be set and saved but, by reason of its condition and the bleeding therefrom, it constituted a menace to the life of the plaintiff. An emergency from accident confronted the defendant and his skilled judgment told him he must amputate at once. In this he was joined by his associate in the operation.

The appellant objects because the instructions did not define "emergency" and "implied consent" and because the instructions were not sufficiently specific in reference to the matter of notice to the parents of the plaintiff. While the plaintiff requested eight instructions, all of which were refused, none of them pertained to a definition of implied consent or emergency.

The court's instructions in reference to the consent of the

parents were entirely fair to the plaintiff. In substance, the jury was told, among other things, that, in the absence of an emergency calling for immediate action for the preservation of the life or health of the patient, an operation on a patient in possession of his faculties and in such physical health as to be able to consult about his condition, without the consent, express or implied, of the patient, or someone authorized to act for him, constitutes an assault.

While the courts are not entirely in harmony upon the question of consent to an operation, we think the better reasoning supports the proposition that if a surgeon is confronted with an emergency which endangers the life or health of the patient, it is his duty to do that which the occasion demands within the usual and customary practice among physicians and surgeons in the same or similar localities, without the consent of the patient.

In Delahunt v. Finton, (Mich.) 221 N. W. 168, that court said:

"Plaintiff claims the court erred in his instructions concerning a surgical emergency. It is settled that a surgeon may lawfully perform, and it is his duty to perform, such operation as good surgery demands, in cases of emergency, without the consent of the patient. Luka v. Lowrie, 171 Mich. 122, 136 N. W. 1106, 41 L. R. A. (N. S.) 290, Pratt v. Davis, 224 Ill. 300, 79 N. E. 562, 7 L. R. A. (N. S.) 609, 8 Ann. Cas. 197. In so doing he is not liable for an honest error in judgment. Luka v. Lowrie, 171 Mich. 122, 136 N. W. 1106, 41 L. R. A. (N. S.) 290, Williams v. Poppleton, 3 Or. 139. In conduct, like that of a surgeon, resting upon judgment, opinion, or theory, the ordinary rules for determining negligence do not prevail. Luka v. Lowrie, 171 Mich. 122, 136 N. W. 1106, 41 L. R. A. (N. S.) 290; The Tom Lysle (D. C.) 48 F. 690; Brown v. French, 104 Pa. 604; Williams v. LeBar, 141 Pa. 149, 21 A. 525. One reason for the rule is that, when one acts according to his best judgment in an emergency, he is not chargeable with negligence. Luka v. Lowrie, 171 Mich. 122, 136 N. W. 1106, 41 L. R. A. (N. S.) 290; Staloch v. Holm, 100 Minn. 276, 111 N. W. 264, 9 L. R. A. (N. S.) 712; Williams v. Poppleton, 3 Or. 139; 30 Cyc. 1587; Sherwood v. Babcock, 208 Mich. 536, 175 N. W. 470."

In McGuire v. Rix, 225 N. W. 120 (Nebr.), the surgeon was charged with failure to make proper efforts to reduce the fracture by external manipulation and extension before resorting to a surgical operation. The court said:

"How far such efforts should have been pursued under all the circumstances was a question of professional judgment which defendants exercised. In this respect there is nothing to show that they were prompted by unworthy motives or that they acted in bad faith or that they did not possess and exercise the degree of skill and care ordinarily possessed and exercised by physicians and surgeons in Omaha. A capable physician and surgeon in active practice would naturally hesitate to treat a case like plaintiff's, if he could be held liable in damages for abandoning treatment by external manipulation, after having earnestly tried it until his judgment told him that further efforts of that kind would be hazardous and unavailing, before resorting to a surgical operation that is the only alternative. If such were the law, a person in dire need of professional skill in a distressing emergency might be left without necessary attention. The presumption is that a licensed, skillful physician in active practice performs his duties with the requisite degree of skill and care, in absence of evidence to the contrary."

There is in the case at bar no showing whatever of unworthy motives or bad faith. There is no evidence of any attempt to mislead.

In McGuire v. Rix, 225 N. W. (Nebr.) 120, supra, there was evidence on behalf of the plaintiff that the doctors, before giving the plaintiff an anaesthetic, told the plaintiff they would be able to reduce the fracture, under an anaesthetic, by manipulation. This was strenuously denied by the defense. The court said:

"Each defendant, however, denied the giving of assurance that an operation would not be performed; but, accepting as true her version of what defendants said to her, it does not follow that she did not consent to a necessary operation. She admitted defendants were called to reduce the fracture. At the time of the conversations defendants had not together attempted to reduce the fracture by manipulation. If they made the remarks attributed to them, they may then have considered

an operation unnecessary, though they had discreetly prepared for one. Their responsibility for an operation accrued when manipulation failed. The law did not require defendants to restore plaintiff to consciousness for the purpose of procuring consent to surgery—the only alternative in the line of professional duty for which they were called. The use of anaesthesia in modern surgery has modified to some extent the ancient rule of the common law requiring consent. Of course, the general rule requires consent of the patient, but consent may be implied from circumstances and an operation may be demanded by an emergency without consent. Delahunt v. Finton, 244 Mich. 226, 221 N. W. 168; Mohr v. Williams, 95 Minn. 261, 104 N. W. 12, 1 L. R. A. (N. S.) 439, and cases cited in note, 111 Am. St. Rep. 462, 5 Ann. Cas. 303; Luka v. Lowrie, 171 Mich. 122, 136 N. W. 1106, 41 L. R. A. (N. S.) 290, and cases cited in note; King v. Carney, 85 Okl. 62, 204 P. 270, 26 A. L. R. 1032, and cases cited in note.''

In the above case, the court directed a verdict for the defendant.

In Luka v. Lowrie, (Mich.) 136 N. W. 1106, 41 L. R. A. (N. S.) Page 290, an action was brought by the plaintiff to recover damages for amputating plaintiff's foot without his consent or that of his parents. He was a boy fifteen years of age who was injured in an accident. In the course of the opinion sustaining a directed verdict for the defendant, the court said, among other things:

"In an ordinary action for negligence, the fact that defendant has acted according to his best judgment is no defense. * * * In conduct, resting upon judgment, opinion, or theory, however, a different rule has been recognized. * * * 'One reasonable justification for this exception is the elementary principle that when a man acts according to his best judgment in an emergency, but fails to act judiciously, he is not chargeable with negligence. Physicians, in the nature of things, are sought for and must act in emergencies, and, if a surgeon waits too long before undertaking a necessary amputation, he must be held to have known the consequences of such delay, and may be held liable for the resulting damage',—citing Du Bois v. Decker, 130 N. Y. 325, 29 N. E. 313, 14 L. R. A. 429, 27 Am.

St. Rep. 529; Martin v. Courtney, 75 Minn. 255, 77 N. W. 813. It would be unreasonable to hold a properly qualified physician or surgeon responsible for an honest error of judgment, where, as in the instant case, he is called upon to act in an emergency and must choose between two courses of action, either one of which involves the possibility of the gravest hazard to the patient. As was said by Upton, J., in Williams v. Poppleton, 3 Or. 139: 'In cases like this the court and jury do not undertake to determine what is the best mode of treatment, or to decide questions of medical science upon which surgeons differ among themselves.' It is, we think, very clear upon this record that the question presented to the defendant, at the moment he was called upon to act, was one of judgment only. Instant action of some sort was imperative. * * * Called upon to act under such circumstances, and to determine which of two courses (one entailing certain mutilation and the other probable death to the patient) should be followed, it is apparent that the defendant is not bound by the ordinary rules of negligence, but is entitled to insist that, having used his best judgment, he is not liable. * * * But defendant testifies, and in this he is not contradicted, that he made inquiry for relatives of the plaintiff and was told that none were in the hospital. Suppose that his informant was in error (which is not certain) the defendant had a right to rely upon the information, and to act in the emergency upon the theory that to obtain consent was impracticable. In Pratt v. Davis, 224 Ill. 309, 79 N. E. 565, 7 L. R. A. (N. S.) 609, 8 Ann. Cas. 197, it was said: 'In such event the surgeon may lawfully, and it is his duty to, perform such operation as good surgery demands without such consent.' ''

Other cases might be quoted, but the foregoing, with the cases cited, is sufficient.

In this complicated life which we are now living, surrounded on every hand by complicated machinery and rapid transportation of all sorts, with more or less serious accidents occurring very frequently, with persons, young, middle-aged and old, carried in great numbers daily into offices and hospitals, more or less injured and mangled, the rules of conduct on the part of trained and educated expert surgeons must be fixed to reasonably fit the conditions. If the surgeon, confronted by an emergency, is not to be permitted, after having fairly

and carefully examined the situation, to exercise his professional judgment in his honest endeavor to save human life, then the public at large must suffer. If the surgeon is not to be permitted to honestly use his best judgment upon the necessity for an operation, without waiting to get the consent of either the patient or his parents, then is the skilled hand of the expert stayed by an unreasonable rule, often to the detriment of the patient and humanity at large.

Upon the facts in the case at bar, there is no merit in the appellant's complaint on this subject. Indeed, upon the facts of this case, the court might very properly have directed a verdict for the defendant.

VI. The foregoing disposes of all of the errors properly presented and argued by the appellant. There are a number of other questions raised, but they are not presented within the requirements of the rules of this court and will not be considered.

It follows that the cause must be, and is,—Affirmed.

ALBERT, C. J., and EVANS, MORLING, and KINDIG, JJ., concur.