### PHOEBE G. KENNEDY v. DR. FOUNTAIN PARROTT.

(Filed 13 January, 1956.)

**1. Physicians and Surgeons § 14—**

A surgeon may not be held liable on the basis of negligence for conduct resting upon judgment, opinion or theory when the surgeon possesses the requisite skill and ability and acts according to his best judgment and in a careful and prudent manner.

**2. Evidence § 5—**

Courts may take judicial notice of any fact in the field of any particular science which is either so notoriously true as not to be the subject of reasonable dispute or which is capable of demonstration by resort to readily accessible sources of indisputable accuracy, and judges may inform themselves as to such facts by reference to standard works on the subject.

**3. Trial § 22b—**

While ordinarily defendant's evidence which contradicts that of plaintiff is not to be considered on motion to nonsuit, in an action for malpractice the testimony of defendant's expert witnesses which discloses known and generally accepted facts, corroborated by textbook statements, in regard to the particular disease or ailment in controversy, may be considered.

**4. Trial §§ 22a, 23a—**

While plaintiff's testimony of statements made by defendant, even though denied by defendant, must be taken as true in passing upon defendant's motion to nonsuit, yet when such statements are in direct conflict with scientific fact, they may be lacking in sufficient probative force to require their submission to the jury.

**5. Physicians and Surgeons § 20—Evidence held insufficient to be submitted to the jury in this action for malpractice.**

Plaintiff's evidence was to the effect that during an operation for appendicitis defendant surgeon found enlarged cysts on plaintiff's left ovary and punctured them, and that after the operation plaintiff developed phlebitis in her leg. Plaintiff also offered testimony of statements by defendant and another surgeon for the purpose of showing that while puncturing one of the cysts the surgeon cut a blood vessel, causing the phlebitis. There was no evidence that defendant did not possess the requisite skill and ability or that he failed to exercise the proper care in performing the operation, other than the testimony of the statements, and defendant introduced expert testimony, corroborating textbook statements, in direct conflict with the statements as to the cause of phlebitis. *Held:* Nonsuit was proper.

**6. Physicians and Surgeons § 14—**

The acceptance of a person as a patient by a physician or surgeon does not create a contract in the ordinary sense of that word, but rather a status or relationship, although in any event the agreement imposes on the physician or surgeon the duty, in the treatment of the patient, to apply his skill and ability in a careful and prudent manner.

**7. Physicians and Surgeons § 15½—**

Where a patient consents to a major internal operation, the consent, in the absence of proof to the contrary, will be construed as general in nature, and the surgeon may lawfully perform, and it is his duty to perform, such operation as good surgery demands, even when it means an extension of the operation further than was originally contemplated in order to remedy any abnormal or diseased condition discovered in the area of the original incision.

**8. Physicians and Surgeons § 20—Evidence held not to show that extension of operation in accordance with surgical procedure was unauthorized.**

Plaintiff's evidence tended to show that she consented to an operation for appendicitis, and that while performing the operation defendant discovered enlarged cysts on plaintiff's left ovary, and punctured them. There was no evidence that defendant exercised bad judgment or that the extended operation was not dictated by sound surgical procedure, but to the

contrary there was expert testimony that the puncture of the cysts was in accordance with sound surgical practice. *Held:* The evidence fails to make out a *prima facie* case of technical assault and battery on the ground that the extended operation was unauthorized.

APPEAL by plaintiff from *Parker (Joseph W.), J.,* May Term, 1955, LENOIR. Affirmed.

Civil action to recover damages for personal injuries resulting from an alleged unauthorized operation performed by the defendant, a surgeon.

The plaintiff consulted the defendant as a surgeon. He diagnosed her ailment as appendicitis and recommended an operation to which she agreed. During the operation the doctor discovered some enlarged cysts on her left ovary, and he punctured them. After the operation the plaintiff developed phlebitis in her leg. She testified that Doctor Parrott told her "that while he was puncturing this cyst in my left ovary that he had cut a blood vessel and caused me to have phlebitis and that those blood clots were what was causing the trouble." She also testified that defendant told Dr. Tyndall, who was called in to examine her for her leg condition, "that while he was operating he punctured some cysts on my ovaries, and while puncturing the cyst on my left ovary he cut a blood vessel which caused me to bleed," to which Dr. Tyndall said, "Fountain, you have played hell."

The defendant recommended that the plaintiff go to Duke Hospital, and there is evidence he promised he would pay the bill. She also saw Dr. I. Ridgeway Trimble at Johns Hopkins, Baltimore. Dr. Trimble operated on her left leg and side "to try to correct the damage that was done."

Plaintiff had to undergo considerable pain and suffering on account of the phlebitis and still has some trouble with it.

At the conclusion of the testimony, the court, on motion of the defendant, entered judgment of involuntary nonsuit. Plaintiff excepted and appealed.

*Owens & Langley for plaintiff appellant.*
*Marion A. Parrott and John G. Dawson for defendant appellee.*

BARNHILL, C. J. Plaintiff's action as alleged in her complaint is an action for damages for personal injury proximately resulting from the negligence of the defendant in performing an operation on her. The only allegation in the complaint which gives any indication it is an action for damages proximately resulting from an alleged technical assault or trespass upon the person of plaintiff is the allegation that the puncturing of the cysts on her ovary was unauthorized.

Dealing first with the cause of action alleged, it is to be noted that plaintiff made no effort in the court below to prove the defendant did not possess the requisite skill and ability, and she offered no evidence that he failed to exercise due and proper care in performing the operation other than her testimony as to what the defendant said and what Dr. Tyndall said in his presence. She tendered no expert testimony.

In the first place, where the conduct relied on rests upon judgment, opinion, or theory, such as in case of a surgeon performing an operation, the ordinary rules for determining negligence do not prevail. The reason is that when one who possesses the requisite skill and ability acts according to his best judgment and in a careful and prudent manner, he is not chargeable with negligence. *Hunt v. Bradshaw*, 242 N.C. 517, and cases cited; *Jackovach v. Yocom*, 237 N.W. 444, and authorities cited. See also Annos. 26 A.L.R. 1036, 53 A.L.R. 1056, and 139 A.L.R. 1370.

Furthermore, proof of error of judgment and nothing more will not suffice. *Jackovach v. Yocom, supra,* and cases cited. And the defendant testified that the cysts he punctured were slightly less than an inch in diameter, and that he felt "that these cysts were large enough to be potentially dangerous . . ."

A judge or court may take judicial notice of any fact in the field of any particular science which is either so notoriously true as not to be the subject of reasonable dispute or is capable of demonstration by resort to readily accessible sources of indisputable accuracy. Judges may inform themselves as to such facts by reference to standard works on the subject. *Hopkins v. Comer*, 240 N.C. 143, 81 S.E. 2d 368, and authorities cited; Stansbury, N. C. Evidence, sec. 11.

In applying this rule we need not enter into any extended discussion as to whether the puncture of the cysts on plaintiff's ovaries proximately caused her phlebitis. Suffice it to say that among physicians, surgeons, and others who make it their business to know the physiology of the human body, it is an accepted fact that (1) phlebitis of the leg is caused by the inflammation of a vein in the leg, and (2) when the inflammation becomes acute, it may cause the formation of blood clots which produce thrombophlebitis.

Phlebitis is at times a postoperative or pregnancy complication. When it develops after an operation, its cause is the combination of the operative procedures, that is, the anesthesia, the shock of the operation, and the confinement to bed which, in combination, cause a slowing of the blood flow and dehydration of the blood, which produces inflammation and the formation of blood clots which further block the flow of blood which causes a swelling of the leg, redness, and tenderness. Lippincott's Quick Reference Book for Medicine and Surgery, 14th ed.,

p. 570; Blumer, The Therapeutics of Internal Diseases, Vol. 3, p. 568; Cecil, Textbook of Medicine, p. 1287.

While on a motion to nonsuit we may not consider the testimony offered by defendant as it tends to contradict the evidence offered by the plaintiff, we may consider the evidence of defendant's expert witnesses for the purpose of ascertaining what are the known and generally accepted facts about phlebitis, as it tends to corroborate the textbook statements in respect thereto. Indeed, in our opinion, the trial judge had the right to call upon experts in the science of medicine to inform him on the subject. *Hunt v. Bradshaw, supra; Hopkins v. Comer, supra.*

The defendant denied he made the statements attributed to him by the plaintiff. Even so, for the purposes of this appeal, we must assume that he did make them. But then, he offered five expert surgeons and physicians who testified that (1) if the defendant made the statements attributed to him, he was in error, and (2) the phlebitis was the result of the operative procedures—the anesthesia, the operation, and the confinement to bed—which caused a slowing of the plaintiff's blood and tended to cause a dehydration thereof which in turn produced the phlebitis and the clotting of the blood.

Thus it appears that if defendant made the statements upon which the plaintiff relies, they are so in conflict with known scientific facts that they are lacking in sufficient probative force to require their submission to a jury. Therefore, if the cause was tried in the court below on the allegation of negligence contained in the complaint, the judgment of nonsuit was well advised.

On the other hand, if her cause of action is for damages for personal injuries proximately resulting from an assault or trespass on her person, as she now asserts, and such operation was neither expressly nor impliedly authorized, she is entitled at least to nominal damages.

The contents of the record and her brief clearly indicate that, whatever the theory of the trial below may have been, she is now seeking to recover on this latter theory.

It is stated in the case on appeal that the puncturing of the cysts constituted an unauthorized operation on her by the defendant. A similar statement is contained in her brief. In addition thereto, the brief contains the following:

"The plaintiff earnestly contends that the trial Court erred in granting the defendant's motion for judgment of nonsuit at the conclusion of all the evidence for that the plaintiff had introduced sufficient evidence to make out a case of assault and battery or trespass to the person by the performance of an unauthorized operation upon her by the defendant. . . ."

Furthermore, her whole argument and citation of authorities are directed to that contention.

While the law of contracts is applied as between a patient and his physician or surgeon, when a person consults a physician or surgeon, seeking treatment for a physical ailment, real or apparent, and the physician or surgeon agrees to accept him as a patient, it does not create a contract in the sense that term is ordinarily used. Usually there is no specification or particularization as to what the physician shall do. The patient selects, and commits himself to the care of, the doctor because he is confident the doctor possesses the requisite skill and ability to treat—and will treat—his physical ailment and restore him to normal good health. The physician, after diagnosing the ailment, prescribes the treatment or the medicine to be administered; but the patient is under no legal obligation to follow the physician's instructions. Thus it is apt and perhaps more exact to say it creates a status or relation rather than a contract. In any event, agreement imposes on the physician or surgeon the duty, in the treatment of the patient, to apply his skill and ability in a careful and prudent manner.

Prior to the advent of the modern hospital and before anesthesia had appeared on the horizon of the medical world, the courts formulated and applied a rule in respect to operations which may now be justly considered unreasonable and unrealistic. During the period when our common law was being formulated and applied, even a major operation was performed in the home of the patient, and the patient ordinarily was conscious, so that the physician could consult him in respect to conditions which required or made advisable an extension of the operation. And even if the shock of the operation rendered the patient unconscious, immediate members of his family were usually available. Hence the courts formulated the rule that any extension of the operation by the physician without the consent of the patient or someone authorized to speak for him constituted a battery or trespass upon the person of the patient for which the physician was liable in damages.

However, now that hospitals are available to most people in need of major surgery; anesthesia is in common use; operations are performed in the operating rooms of such hospitals while the patient is under the influence of an anesthetic; the surgeon is bedecked with operating gown, mask, and gloves; and the attending relatives, if any, are in some other part of the hospital, sometimes many floors away, the law is in a state of flux. More and more courts are beginning to realize that ordinarily a surgeon is employed to remedy conditions without any express limitation on his authority in respect thereto, and that in view of these conditions which make consent impractical, it is unreasonable to hold the physician to the exact operation—particularly when it is internal—that

his preliminary examination indicated was necessary. We know that now complete diagnosis of an internal ailment is not effectuated until after the patient is under the influence of the anesthetic and the incision has been made.

These courts act upon the concept that the philosophy of the law is embodied in the ancient Latin maxim: *Ratio est legis anima; mutata legis ratione mutatur et lex.* Reason is the soul of the law; the reason of the law being changed, the law is also changed.

Some of the courts which realize that in view of modern conditions there should be some modification of the strict common law rule still limit the right of surgeons to extend an operation without the express consent of the patient to cases where an emergency arises calling for immediate action for the preservation of the life or health of the patient, and it is impracticable to obtain his consent or the consent of someone authorized to speak for him. *Jackovach v. Yocom, supra; King v. Carney,* 204 P. 270, 26 A.L.R. 1032.

Other courts, though adhering to the fetish of consent, express or implied, realize "that the law should encourage self-reliant surgeons to whom patients may safely entrust their bodies, and not men who may be tempted to shirk from duty for fear of a law suit." They recognize that "the law does not insist that a surgeon shall perform every operation according to plans and specifications approved in advance by the patient and carefully tucked away in his office-safe for courtroom purposes." *Barnett v. Bachrach,* 34 A. 2d 626.

This view, to which we subscribe, is fully stated in *Bennan v. Parsonnet,* 83 A. 948, as follows:

"Without stopping to point out the fallaciousness of the premise that a surgical operation can be contracted for or performed according to plans and specifications, it is enough to say that the entire foundation of the supposed analogy is swept away by the surgical employment of anaesthesia, which renders the patient unable to consent at the very time that the rule of the common law required that his consent be obtained; for in those days the patient (such was the horror of it) was a conscious participant in such surgical operations as were then performed, and as his consent could be obtained the rule of the common law was that it must be obtained.

"The surgical employment of anaesthesia has, as a matter of common knowledge, not only eliminated the possibility of obtaining the patient's consent during the operation, but has also had other radical effects of which notice must be taken. Thus it has rendered possible and of everyday occurrence surgical operations of a character and magnitude not dreamed of at the time the common law was in the making, and, as a matter of practical moment, has also advanced the period that marks

the commencement of a surgical operation from the time when the patient's body is actually invaded by the knife to the time when the anaesthetic is administered, or at least when the patient has succumbed to its influence. The employment of anaesthesia has also postponed to this same period of relaxation and unconsciousness the making of that complete and final diagnosis of the patient's condition that at common law was made at a time when he could be both informed and consulted. By these considerations the scope of modern surgical operations has been greatly enlarged, and the legal rule applicable thereto extended beyond the emergencies of actual surgery to other matters more or less vitally affecting the patient's welfare. To meet these changed conditions, the rule of law must, in the interest alike of the patient and the surgeon, be adapted to the changes that have been so wrought, chief among which is the unconscious state of the patient at a time when by the common-law rule his consent must be obtained. To meet this fundamental change in the condition of the patient, it is imperative that the law shall in his interest raise up some one to act for him—in a word, to represent him in those matters affecting his welfare concerning which he cannot act for himself because of a condition that has become an essential part of the operation.

". . . if no one has been so appointed, the law by its constructive power will raise up such a representative without which the welfare and even the life of the patient might be needlessly sacrificed. To meet the requirements of the case, such representative should not only keenly appreciate the nature of the duty that is thus cast upon him, but also be possessed of the knowledge and skill to perform such duty with wisdom and promptness. He should also be one in whom the patient reposes confidence and on whose judgment he would presumably rely. The surgeon whom the patient himself has selected alone fills all of these requirements, and hence upon him the law should cast the responsibilities of this office by the legal implication that the patient intended him to act for him when he made no other selection."

In major internal operations, both the patient and the surgeon know that the exact condition of the patient cannot be finally and definitely diagnosed until after the patient is completely anesthetized and the incision has been made. In such case the consent—in the absence of proof to the contrary—will be construed as general in nature and the surgeon may extend the operation to remedy any abnormal or diseased condition in the area of the original incision whenever he, in the exercise of his sound professional judgment, determines that correct surgical procedure dictates and requires such an extension of the operation originally contemplated. This rule applies when the patient is at the time incapable of giving consent, and no one with authority to consent

for him is immediately available. *King v. Carney, supra; Baxter v. Snow,* 2 P. 2d 257; *Jackovach v. Yocom, supra.*

In short, where an internal operation is indicated, a surgeon may lawfully perform, and it is his duty to perform, such operation as good surgery demands, even when it means an extension of the operation further than was originally contemplated, and for so doing he is not to be held in damages as for an unauthorized operation.

"Where one has voluntarily submitted himself to a physician or surgeon for diagnosis and treatment of an ailment it, in the absence of evidence to the contrary, will be presumed that what the doctor did was either expressly or by implication authorized to be done." *Baxter v. Snow, supra.*

Unexpected things which arise in the course of an operation and incidental thereto must generally at least be met according to the best judgment and skill of the surgeon. *Higley v. Jeffrey,* 8 P. 2d 96. And ordinarily a surgeon is justified in believing that his patient has assented to such operation as approved surgery demands to relieve the affliction with which he is suffering. *Dicenzo v. Berg,* 16 A. 2d 15.

Here plaintiff submitted her body to the care of the defendant for an appendectomy. When the defendant made the necessary incision he discovered some enlarged follicle cysts on her ovaries. He, as a skilled surgeon, knew that when a cyst on an ovary grows beyond the normal size, it may continue to grow until it is large enough to hold six to eight quarts of liquid and become dangerous by reason of its size. The plaintiff does not say that the defendant exercised bad judgment or that the extended operation was not dictated by sound surgical procedure. She now asserts only that it was unauthorized, and she makes no real showing of resulting injury or damage.

In this connection it is not amiss to note that the expert witnesses testified that the puncture of the cysts was in accord with sound surgical procedure, and that if they had performed the appendectomy they would have also punctured any enlarged cysts found on the ovaries. "That is the accepted practice in the course of general surgery."

What was the surgeon to do when he found abnormal cysts on the ovaries of plaintiff that were potentially dangerous? Was it his duty to leave her unconscious on the operating table, doff his operating habiliments, and go forth to find someone with authority to consent to the extended operation, and then return, go through the process of disinfecting, don again his operating habiliments, and then puncture the cysts; or was he compelled, against his best judgment, to close the incision and then, after plaintiff had fully recovered from the effects of the anesthesia, inform her as to what he had found and advise her that

these cysts might cause her serious trouble in the future? The operation was simple, the incision had been made, the potential danger was evident to a skilled surgeon. Reason and sound common sense dictated that he should do just what he did do. So all the expert witnesses testified.

Therefore, we are constrained to hold that plaintiff's testimony fails to make out a *prima facie* case for a jury on the theory she brings her appeal to this Court. The judgment entered in the court below is

Affirmed.