### HARRIS BENNAN v. VICTOR PARSONNET.

Submitted March 21. 1912—Decided July 13, 1912.

1. The plaintiff applied to the defendant to perform a surgical operation upon a rupture in his left groin. After the patient had been etherized a rupture on the right side was discovered of a character more seriously endangering the life and health of the patient than the other. The defendant having operated upon the more serious rupture was sued by his patient for assault and battery and a substantial verdict recovered which (1) is set aside as against the weight of evidence with (2) a statement of the question that should be left to the jury in view (3) of the adaptation of the common law rule to the employment of anæsthesia in surgical operations.

2. When a person has selected a surgeon to perform an operation under anæsthesia and has appointed no other person to represent him during the period of unconsciousness, the law will, by implication, constitute the surgeon the representative of his patient and will cast upon him the responsibility of so acting in his interest that he shall receive the full benefit of that professional judgment and skill to which he is entitled; this implication which protects the surgeon while acting within its scope, confers no right upon him to perform an operation of a sort different from that to which his patient had consented or that involved risks or results of a kind not contemplated.

On rule to show cause.

The plaintiff applied to the defendant to operate upon a rupture in his left groin that had been unsuccessfully operated upon two years before by another surgeon. Upon learning that the plaintiff was a poor man the defendant engaged to operate free of charge. At the time fixed for the operation the plaintiff was placed under the anæsthetic by two assisting surgeons who, when Dr. Parsonnet came into the operating room, directed his attention to a rupture they had just discovered in the patient's right groin which, upon examination and the employment of the usual diagnostic tests, was determined by the three surgeons to be a serious menace to the patient and likely to cause his death should strangulation occur, dangers not to be apprehended from the rupture that had once been operated upon. Dr. Parsonnet thereupon operated upon the more serious rupture intending to operate also upon the other, which he was prevented from doing by the patient's condition under the anæsthetic. The patient upon being informed that the operation would be completed on a following day, apparently acquiesced, but later declined to go on with the operation and brought this action against the defendant for assault and battery.

The jury under the charge of the court found that the defendant had performed an operation upon the plaintiff without his consent and rendered a verdict of $1,000 against him.

Before GUMMERE, CHIEF JUSTICE, and Justices GARRISON and SWAYZE.

For the rule, *Philip J. Schotland.*

*Contra, Charles B. Dunn.*

The opinion of the court was delivered by

GARRISON, J. This verdict cannot be permitted to stand; it is against the clear weight of evidence. The trial court

charged the jury that the operation was a legal wrong to the plaintiff unless · he had consented to its performance, explaining to them that such consent as to conditions discovered after the operation had actually commenced might be inferred from circumstances, and that it should be inferred if. the condition thus discovered endangered the life or health of the patient, leaving to them the question whether the condition for which the defendant had operated was of this character. Upon the question thus submitted to the jury the evidence was overwhelmingly against the verdict. The testimony of unimpeached medical witnesses that the rupture that was operated upon was a serious menace to the health of the plaintiff, and even to his life should it become strangulated, was not even attempted to be contradicted. Upon this point the direct testimony of the witnesses who had personal knowledge of the facts was corroborated by that of Dr. Edward J. Ile, who is shown by the testimony to be a surgeon of great experience and a recognized authority in his profession.

A verdict rendered in the face of this testimony can rest only upon the assumption of superior knowledge by the jury.

The duty of the jury was to render a verdict upon the evidence, and that it did not do.

The verdict must therefore be set aside without regard to whether the question that was left to the jury was or was not the precise question that should have been submitted to them. We think that it was not. It is true that the judge in his charge laid down the common law rule with substantial correctness, but it is also true that the introduction of anæsthesia into the practice of surgery has modified the application of the common law rule in certain fundamental respects of which the law must take notice.

The trial judge in his charge followed the opinion of Judge Brown in *Mohr* v. *Williams,* decided by the Supreme Court of Minnesota (95 *Minn.* 261), which, as annotated in 1 *L. R. A.* (*N. S.*) 439, correctly presents the common law rule upon the subject. That rule is thus stated in 1 *Kinkead on Torts,* § 375: "The patient must be the final

arbiter as to whether he shall take his chances with the operation or take his chances of living without it. Such is the natural right of the individual which the law recognizes as a legal right. Consent therefore of an individual must be either expressly or impliedly given before a surgeon may have the right to operate."

In general justification of this common law rule Judge Brown says this in his opinion:

"There is logic in the principle thus stated, for in all other trades, professions or occupations contracts are entered into by the mutual agreement of the interested parties, and are required to be performed in accordance with their letter and spirit. No reason occurs to us why the same rule should not apply between physician and patient."

Without stopping to point out the fallaciousness of the premise that a surgical operation can be contracted for or performed according to plans and specifications, it is enough to say that the entire foundation of the supposed analogy is swept away by the surgical employment of anæsthesia which renders the patient unable to consent at the very time that the rule of the common law required that his consent be obtained. For in those days the patient (such was the horror of it) was a conscious participant in such surgical operations as were then performed, and as his consent could be obtained the rule of the common law was that it must be obtained.

The surgical employment of anæsthesia has, as matter of common knowledge, not only eliminated the possibility of obtaining the patient's consent during the operation, but has also had other radical effects of which notice must be taken. Thus it has rendered possible and of every day occurrence surgical operations of a character and magnitude not dreamed of at the time the common law was in the making and, as a matter of practical moment, has also advanced the period that marks the commencement of a surgical operation from the time when the patient's body is actually invaded by the knife to the time when the anæsthetic is administered or at least when the patient has succumbed to

its influence. .The employment of anæsthesia has also post-
poned to this same period of relaxation and unconsciousness
the making of that complete and final diagnosis of the ·pa-
tient's condition. that at common law was made at a time
when he could · be both informed and consulted.   By these
·considerations the scope of modern surgical operations has
been greatly enlarged and the legal rule applicable thereto
·extended ·beyond the emergencies of actual surgery to other
matters more or less vitally affecting the patient's welfare.
To meet these changed conditions the rule of law must, in
the interest alike of the patient and the surgeon, be adapted
to the changes that have been so wrought, chief among which
is the unconscious state of the patient at a time when by the
common law · rule his consent must be obtained.   To meet
this fundamental change in the condition of the .patient it
is imperative that the law shall in his interest raise up some
one to act for ·him—in a word, to represent him in those·
matters affecting his welfare concerning which he cannot
act for himself because of a condition that has become an
essential part of the operation.

If such a representative has been chosen by the patient
himself the rule we are considering has no application, but
if no one has been so appointed the law by its constructive
power will raise up such a representative without which the
welfare and even the life of the patient might be needlessly
sacrificed.   To meet the requirements of the case such repre-
sentative should not only keenly appreciate the nature of the
duty that is thus cast upon him but also be possessed of the
knowledge and skill to perform such duty with wisdom and
promptness;  he should also be one in whom the patient re-
poses confidence and on whose judgment he would pre-
sumably rely.   The surgeon whom the patient himself has
selected alone fills all of these requirements, and hence upon
him the law should cast the responsibilities of this office by
the legal implication that the patient intended him to act
for him when he had made no other selection.

This implication accords with those analogies of the com-
mon law by which prompt and timely aid to accidentally in-

jured or unconscious persons is secured from those not expressly authorized to render it. And I have no doubt that should such an accident occasion a depression of the skull that rendered the injured person unconscious the consent of such person to the necessary surgical operation would be implied at common law, although I find no such reported case. A like analogy to some extent is found in the American decisions touching actions for compensation for services rendered to unconscious persons, a topic upon which the English cases are silent owing to that hallucinatory *honorarium* upon which the learned professions in Great Britain are supposed to rely for their subsistence. At bottom these analogies all rest upon the maxim that one is presumed to accept that which is beneficial to him, a doctrine that, if applied to commerce and the transfer of property, should surely be applied where life and health are at stake.

The conclusion therefore to which we are led is that when a person has selected a surgeon to operate upon him and has appointed no other person to represent him during the period of unconsciousness that constitutes a part of such operation, the law will by implication constitute such surgeon the representative *pro hac vice* of his patient and will, within the scope to which such implication applies, cast upon him the responsibility of so acting in the interest of his patient that the latter shall receive the full benefit of that professional judgment and skill to which he is legally entitled.

Such implication affords no license to the surgeon to operate upon a patient against his will or by subterfuge, or to perform upon him any operation of a sort different from that to which he had consented, or that involved risks and results of a kind not contemplated. As to such matters the rule in question submits nothing to the judgment of the surgeon, who as the implied representative of his patient can under such implication truly represent him only in so far as he gives to him the benefit of his professional wisdom within the general lines of the curative treatment agreed upon between them; unless, of course, a wider discretion has been accorded to him. Within such general lines, how-

ever, much is necessarily left to the good judgment of the operating surgeon, just how much will depend upon the circumstances of the individual case.

If the surgeon transcends his implied authority as thus defined the question of his skill and wisdom is irrelevant, since no amount of professional skill can justify the substitution of the will of the surgeon for that of his patient; but where this is not the case and where the act done or the decision made in the interest of the patient is fairly within the implied duty and authority of the surgeon the question for the jury is whether upon the evidence it appears that such professional skill and wisdom as the patient was entitled to receive had been exercised by the surgeon in his behalf, not whether in the opinion of the jury the surgeon had acted wisely or whether the patient had been benefited.

Such being the question for the jury the admissibility of the technical or expert evidence on which its rests presents, as in other cases of relevancy, a preliminary question for the court which, in the present case, the trial judge rightly resolved in favor of the admission of such evidence. A ruling that the operation that was performed by the defendant was of a different sort from that to which the patient had consented would be based upon too narrow a view. The condition for the cure of which the plaintiff applied to the defendant was rupture; he is therefore presumed to have contemplated all of the risks incident to an operation for such a condition. Now, rupture is simply a protrusion of the intestine. Whether it occurs on the right side or on the left the intestine is the same, the muscular wall is the same, the operation is the same, and its dangers and the risks are the same.

In the present case it is not conceivable that if the plaintiff had known that at the same risk and with the same absence of expense he could by the contemplated operation be relieved of a condition that seriously threatened his life and health he would not have assented to it or that he would not have relied upon the judgment and have acted upon advice of the surgeon who was so kindly disposed towards him.

Under these circumstances the operation that was performed was not in any true sense against the will of the patient or in any legal sense an operation of a different sort from that which the plaintiff had consented to undergo.

The trial judge was therefore right in admitting the evidence and in sending the case to the jury, the fact that the proper question was not left to them being amply explained by his having followed the reputable authority to which reference has been made.

The question, however, is one to be settled not by authority but by reason, and its importance is such that it touches at a vital point the interests of the entire public, any member of which may at any time suffer in life or health by the establishment of a rule that will paralyze the judgment of the surgeon and require him to withhold his skill and wisdom at the very juncture when they are most needed, and when, could the patient have been consulted, he would manifestly have insisted upon their being exercised in his behalf.

This concluding suggestion may perhaps be ethical rather than legal, but it does seem that in good morals a patient ought not, in his efforts to obtain a money verdict, be permitted to repudiate the sound judgment exercised in his behalf by the surgeon of his choice in whose judgment, had he been capable of being consulted, he would unquestionably have concurred.

The matter cannot, of course, be put to the jury in this off-hand way which, after all, presents a view of the situation so consonant with common sense and common honesty that it cannot be entirely ignored by this court in dealing with a verdict that is clearly inequitable.