219 N.J. Super. 304 (1987)
530 A.2d 345
KEVIN CANNON AND JOAN AND CHARLES CANNON, HIS GUARDIANS AD LITEM AND JOAN AND CHARLES CANNON, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY BELL TELEPHONE, DEFENDANT-RESPONDENT, AND JOHN DOE, INSTALLER, AND JERRY FILLMORE, DEFENDANTS.[1]
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1987.
Decided July 22, 1987.
*305 Before Judges DREIER, SHEBELL and STERN.
Dara Quattrone argued the cause on behalf of appellants (Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz, attorneys; Dara Quattrone and Thomas J. Vesper on the brief).
Lewis April argued the cause on behalf of respondent (Cooper, Perskie, April, Niedelman, Wagenheim & Weiss, attorneys; Marilou Lombardi on the brief).
The opinion of the court was delivered by STERN, J.A.D.
Plaintiffs, Kevin Cannon, a minor, and his parents, Charles and Joan Cannon, appeal from a judgment in the amount of $64,248.17 entered against defendant New Jersey Bell Telephone *306 Co. (hereinafter defendant) following a jury verdict for plaintiffs. The verdict was premised on the jury's finding that defendant was 100 percent negligent. Plaintiffs appeal only the issue of damages.
The essential facts are not in dispute. On October 30, 1980 between 6:00 p.m. and 6:30 p.m., Kevin Cannon, then 14 years of age, was riding his bicycle on the sidewalk in a residential neighborhood in Ventnor.[2] Kevin testified that he struck a dangling telephone wire which caused him to be "thrown back" off the bicycle. The bike landed on top of Kevin, and the seat hit him in "[t]he groin area."[3]
After the accident, Kevin got up, went home and told his mother what had happened. His mother took him back to the scene of the accident, then to the police station and thereafter to the family's pediatrician, Dr. Gene Norman Schraeder. Dr. Schraeder conducted a complete physical of Kevin, noting in his records that the youth had tenderness and a mild abrasion of the scrotum. Dr. Schraeder indicated his main concern at the time was a cervical neck muscle sprain, for which he recommended rest and a cervical collar. The physician attempted to obtain a urine sample during this examination but was unable to because Kevin had trouble voiding.
About six months after the accident Kevin woke up one morning at about 3:00 a.m. and complained to his parents about pain in his lower abdomen and his inability to urinate. Kevin *307 went to Dr. Schraeder, who conducted an intravenous pyelogram test on April 16, 1981. A week later, Kevin again awoke complaining of inability to urinate. Dr. Schraeder took a blood test on April 24, 1981, which was negative "except for a mild number of white blood cells and a plus one albumin, which is very common in children."
Dr. Schraeder referred Kevin to Dr. Herbert Axilrod, a urologist, for further examination. Dr. Axilrod first saw Kevin on April 28, 1981. Kevin complained of nausea and vomiting. Dr. Axilrod testified that he admitted Kevin to Atlantic City Medical Center for evaluation on May 4, 1981. At the hospital, Dr. Axilrod performed a cystoscopy in which he inserted a tubular structure which has a telescope and light for purposes of observing the urethra channel and bladder. Dr. Axilrod said that an obstruction in the bulbous urethra portion of the channel was observed so he attempted to dilate the strictured area by inserting a narrow guide into the the channel. He then screwed an instrument known as a Phillip's Follower into the narrow guide. Because of difficulty in getting anything through this narrow area of the urethra, Dr. Axilrod decided to leave the catheter in Kevin for four days, while changing the Follower on a daily basis to ones with progressively larger diameters in order to dilate the stricture. Dr. Axilrod testified he thereafter commenced dilation treatment and performed dilation about once every six months so that the channel would not contract.
Dr. Axilrod recommended such treatment for the rest of Kevin's life. The doctor recommended against a urethrotomy or surgery "because first of all I feel that the situation is being adequately handled the way it is. And by handling it the way it is, I think we are avoiding the risks attendant to the surgical procedure." Dr. Axilrod indicated
The first risk is the risk of anesthesia. Another risk is that the urethrotomy may not eliminate the stricture. You may wind up with a stricture which requires dilatation [sic] just as you had before.
........

*308 There is the risk of bleeding. Bleeding is a very common occurrence with this operation and sometimes can be quite severe.
........
There have been reported cases of impotence and a condition called Chordee.
........
Chordee is a curvature of the penis on erection.... [I]t's probably a permanent condition.
........
And ... if there is any damage to the sphincter mechanism ... you run the risk of any damage to the sphincter mechanism which is just proximal to the bladder side of the strictured area. If that should be damaged in any way, you could run the risk of incontinence, inability to control the flow of  . .. . It would be very difficult to correct.
After Kevin's discharge from the hospital on May 8, 1981, he visited Dr. Axilrod's office about 13 times, the last visit being November 25, 1985, for dilation treatment.
Kevin testified that he undergoes the dilation without anesthesia and it takes about "[t]en to fifteen seconds." He experiences bleeding for about two to three days after each dilation, and worries "[a]lmost every day" about "[t]he fear of having it close over and going back to the hospital." He indicated that he was working at the time of trial as a manager of a motel and that he would like to go to school to study art.
Charles Cannon, Kevin's father, testified that after the first dilation in Dr. Axilrod's office his son appeared dizzy and pale. On Kevin's third or fourth visit, during which he was not accompanied by his parents, after leaving the doctor's office, Kevin became incoherent and dizzy and stumbled down the street "holding onto the buildings to get to" his mother's office. After that Mr. Cannon said he always remained with Kevin at the office until the dilation was completed and took him home.
Mr. Cannon indicated that his son was very fearful of the dilation procedure and became "a total recluse" or "basket case" in the days before and after a dilation session. Initially it took Kevin "a long time ... to get over the dialations [sic]." However, by the time of trial he seemed "to get over it maybe *309 within a week." Describing his son's behavior, Mr. Cannon testified,
Kevin's whole personality after the operation changed, and other than going to school, Kevin never left the room. We could sometimes get him to come down for dinner. Most of the time he would eat his meals in his room. Prior to the dialations [sic] he would be in his room. He would be really upset. You can hear him banging things and throwing things. He was just crying. We just couldn't deal with him.
Mr. Cannon said that his son had become less reclusive and "more active socially" by the time of trial, but that he still "goes into fits of anger." Mr. Cannon and his wife continuously discussed with Kevin the need to seek counseling but Kevin "absolutely refuse[d]."
On January 26, 1984, Kevin was examined by Dr. Philip M. Hanno, a urologist retained by defendant. Dr. Hanno confirmed that Kevin did suffer an urethra bulbous stricture resulting from the bicycle or "straddle" accident and recommended surgery (optical urethrotomy) to correct the problem and avoid the need for periodic dilations. In or about September 1984 the Cannons took Kevin to Dr. Victor Carpiniello, a urologist, to discuss surgery. Dr. Carpiniello testified in a deposition partially introduced into evidence that the risks of a dilation procedure performed every six months were greater than that of one-time surgery, known as a visual urethrotomy.
Dr. Carpiniello stated,
Periodic dilitation [sic] can cause urinary tract infections, an increase in the severity of scar tissue causing a worsening of the stricture; urethral bleeding; production of false passages that would interrupt the urinary stream, to name a few.
Dr. Carpiniello indicated other risks and recommended surgery (visual urethrotomy) which he indicated had about a 93 percent success rate. However, he noted that there was as much as a 15 percent risk of psychological or psychogenic impotence and a 20 percent risk of urinary tract infection stemming from such an operation.
According to Dr. Carpiniello,

*310 The complications of visual urethrotomy can also be quite serious. Perforation of the urethra with resultant extravasation and infection of the urine along the corpora of the penis is possible. Also, there have been reported cases of impotence and priapism. These are rare but noteworthy risks.
Urethral bleeding can also be a hazardous complication necessitating blood transfusions and prolonged hospitalization and catheterization.
Postoperative sepsis, that's infection, and urinary infection must also be entertained as possible complications.
Finally, recurrent stricture is always possible. The psychological effects of anesthesia and subsequent catheterization must be mentioned.
A long-term Foley catheter, sometimes up to four weeks, may be a very traumatic psychological factor in dealing with young males especially.
Dr. Carpiniello discussed with Kevin and his parents the surgical procedure and the risks associated with it. Kevin, an adult by the time of the examination by Dr. Carpiniello, did not want the operation because "[i]t wasn't 100 percent positive." Mr. Cannon said he discussed surgery with his wife but did not recommend to his son that he undergo the procedure. As noted, Dr. Axilrod had also advised against surgery.
The Cannons also took their son to Dr. Marshall Levine, a clinical psychologist, for a series of examinations commencing in March of 1984. Dr. Levine spoke with the parents and conducted a number of tests on Kevin, whom he saw five times. In his testimony, Dr. Levine related his diagnosis of Kevin:
He is having a severe problem with thought intrusion, which are situations where, he will not because he wants to, but just because they happen, suddenly have these thoughts and pictures of a traumatic event occurring to him. Specifically what he is bothered by is a picture of the sounding instrument with which the urethra dialation [sic] is performed. So he sees that instrument. And a picture of his awakening in the Intensive Care Unit in the hospital with a catheter and tubes coming out of his body. That picture also assails him, and as you might expect, makes him quite upset and anxious. In addition, he is having tremendous amounts of anger that erupt suddenly, and he does not have adequate capacity to control them. So that has led to some temper outbursts and verbal attacks to people around him that would include friends, family and on one occasion, a customer at the motel where he works.
Dr. Levine said that, although during the examinations Kevin initially indicated he was fine and would not admit to any problems or "anger outbursts," he would talk about his difficulties upon further questioning. While Kevin would tell Dr. Levine during every session that he was fine, Dr. Levine *311 testified that "Kevin is anything but fine." Dr. Levine testified that what Kevin went through at the age of 14
was a terrifying experience for him. He cannot believe that there is any way that he can be sure that that will not happen again. So he is obsessed with a notion that this will occur again. He has no way of knowing that it will not and he is in what will be called an avoidance situation, where this is looming over his head, somewhat like a sword, and he never knows when it's going to fall.
Although Dr. Levine recommended psychological counseling, Kevin refused. In his testimony, Kevin indicated he had no plans to seek psychological or psychiatric treatment. His father testified that he had no psychological or similar problems before the accident.
Dr. Douglas Levinson, a child psychiatrist who examined Kevin on two occasions in May and June 1985, testified that it is often difficult to get an adolescent of Kevin's age to undergo treatment and to cooperate fully for effective counseling. Dr. Levinson also corroborated that during the first two years after the accident there was a "fairly acute period of psychiatric distress" and that
during that period he had relatively severe symptoms of anxiety, of fear of the treatment procedures themselves, of anxiety about what was happening to his genital organs, of, and symptoms of withdrawal from his usual activities of not apparently relating to his previous friends, of not participating actively in anything much outside of the mandatory going to class and then going home and kind of withdrawing from his family.
Dr. Levinson indicated that in the two years before his examination Kevin
seems to have developed now a less intense but more chronic anxiety about what he went through and about the treatment that he continues to have. He worries a great deal about the treatments. He worries about what will happen to his genitals. He worries about whether he will have to go through an operation. He worries about whether he may become impotent from the operation. He worries about what it will be like to continue having treatment if he doesn't have the operation. He worries if he has the operation and becomes impotent, will that mean that he can't be married and have a normal life? He worries that if he doesn't have the operation, will he continue to have treatments where he has blood in his genitals after the treatments? If he has a relationship with a woman or gets married, will that be disgusting to that person?
*312 In January 1985, Kevin was examined by defendant's psychiatrist, Dr. Sidney Starrels. Dr. Starrels testified that in his opinion Kevin did not have any "psychiatric disorder." The psychiatrist noted that the youth was not being treated by anyone, exhibited no "symptoms referable to his mind or state of mind or mental function," and was getting along well socially and in school. Furthermore, Dr. Starrels said that Kevin told him that he felt he did not have any trouble.
Plaintiffs attack the judge's instructions regarding the duty to mitigate damages. In his instructions to the jury the judge charged that it is defendant's obligation to pay past and present medical expenses resulting from the accident if proximately caused by defendant's negligence. The court also charged the jury regarding the obligation to pay damages for "any injury, disability, impairment, discomfort or disfigurement" and for "pain and suffering." With respect to damages the court also stated,
There has been some testimony in this case, not testimony, but questions put to the witnesses in this case by the defense concerning the previous mental makeup of the plaintiff, Kevin. And as I recall, he was an anxious or nervous person, were the tenor of the questions. Your recollection is that which counts in this particular area. That's just my recollection. There is some law that relates to that type of an examination or that area of examination. The law is that a person who negligently injures another must take his victim as he finds him or her. The defendant in this case is not protected from liability by the fact that Kevin Cannon, if you believe this, may have had an underlying condition that contributed to his injury and disability.
........
You have also heard during the closing argument about mitigation of damages. It is a general rule that a plaintiff injured by another's negligence has a duty to exercise ordinary and reasonable care to seek and submit to medical and surgical treatment in order to effect a cure and minimize damages. Failure or refusal to do so bars recovery for consequences which could have been averted by the exercise of such care. In other words, damages that could have been prevented by the plaintiff exercising reasonable care are not damages proximately caused by the defendant's wrongdoing. However, in this State, the injured person is regarded as having a right to avoid, if he chooses, peril to life, however slight, and undue risk to health that go beyond the bounds of reason. A refusal to accept an operation may be unreasonable, if the operation involves no danger to life and no danger to health and no extraordinary suffering, and, *313 according to the best medical or surgical opinion, offers a reasonable prospect of restoration or relief from the disability.
You must take these rules and apply them to the facts of this case and make a determination as to whether or not Kevin is acting reasonable [sic] under the circumstances.
You have heard the testimony concerning risk and so forth and so on. You've heard the doctor for the defense, I think it's Dr. Starrels. You must canvas all of the testimony and make a determination, when you consider this issue of mitigation of damages, whether or not the plaintiff acted reasonably or is acting reasonably in refusing to go through with the visual urethrotomy. I think that's the procedure that has been mentioned by counsel.
In response to the jury's request for a further explanation of the mitigation principle, the judge gave supplemental instructions to the same effect.
The leading case on mitigation of damages due to failure to obtain medical treatment is Budden v. Goldstein, 43 N.J. Super. 340 (App.Div. 1957). There, the court, speaking through then Judge (later Justice) Francis, stated,
It is a well-known general rule that a person injured by another's wrong is obliged to exercise ordinary care to seek medical or surgical treatment so as to effect a cure and minimize damages. Failure or refusal to do so bars recovery for consequences which could have been averted by the exercise of such care. [citations omitted]. However, in this state the injured person is regarded as having the right to avoid `if he chooses, peril to life, however slight, and undue risks to health, and anguish that goes beyond the bounds of reason.' And a refusal to accept an operation is not unreasonable and `therefore unjustifiable in the legal sense, unless it is free from danger to life and health and extraordinary suffering, and, according to the best medical or surgical opinion, offers a reasonable prospect of restoration or relief from the disability. And the reasonableness of the refusal, tested by this standard, is one of fact.' Robinson v. Jackson, 116 N.J.L. 476, 478 (E. & A. 1936). [43 N.J. Super. at 350].
See also Lorenc v. Chemirad Corp., 37 N.J. 56, 78-79 (1962) (Francis, J.).
Since Budden was decided in 1957 there have been substantial developments relating to the individual patient's right to refuse medical treatment. Recently our Supreme Court has made clear that competent individuals generally have the right to accept or reject medical treatment as they deem appropriate. As stated in In the Matter of Farrell, 108 N.J. 335, 347-348 (1987), dealing with the right to terminate life sustaining treatment,

*314 In resolving this case, as well as the two other cases we decide today, we build on the principles established in [Matter of] Quinlan [70 N.J. 10 (1976)] and [Matter of] Conroy [98 N.J. 321 (1985)]. Hence, we start by reaffirming the well-recognized common-law right of self-determination that `[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body....' Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 129-30, 105 N.E. 92, 93 (1914) (Cardozo, J.). In Conroy, we stated that `[t]he right of a person to control his own body is a basic societal concept, long recognized in the common law.' 98 N.J. at 346. We explained that the doctrine of `informed consent' was developed to protect the right to self-determination in matters of medical treatment. Id. at 346-48. This doctrine prescribes the `duty of a physician to disclose to a patient information that will enable him to evaluate knowledgeably the options available and the risks attendant upon each before subjecting that patient to a course of treatment.' Perna v. Pirozzi, 92 N.J. 446, 459 (1983) (citations omitted); see, Conroy, supra, 98 N.J. at 346.
As medical technology has been advancing, the doctrine of informed consent has been developing. Thus, in Conroy we recognized the patient's right to give an informed refusal to medical treatment as the logical correlative of the right to give informed consent. We stated that `a competent adult person generally has the right to decline to have any medical treatment initiated or continued.' Conroy, supra, 98 N.J. at 347. [footnote omitted].
We reject the suggestion that the recent cases regarding patients' rights render Budden outdated because the duty to mitigate is inconsistent with the patient's freedom of choice.[4] While the patient clearly has the right of self-determination with respect to acceptance or rejection of medical treatment, an unreasonable determination should not require the party responsible for the injury to pay greater damages because of the patient's freedom of choice. See generally, Annotation, "Duty of injured person to submit to surgery to minimize tort damages," 62 A.L.R.3d 9, 12-13 (1975); see also Annotation "Duty of injured person to submit to non surgical medical treatment to minimize tort damages," 62 A.L.R.3d 70, 74-75 (1975).
We nevertheless reverse the judgment because the record does not sustain an obligation on the part of Kevin to mitigate damages under the facts of this case. Dr. Carpiniello *315 testified that there was a substantial risk of psychological or psychogenic impotence as a result of the surgery.[5] Dr. Axilrod, the treating urologist, advised against the surgery and based upon that advice, we conclude as a matter of law that Kevin was not unreasonable in electing not to have surgery and run the risk of permanent impotence. This is particularly true because of his age and the normal expectations which accompany maturity. Moreover, while Kevin rejected psychological counseling which was recommended by Dr. Levine, this teenager should not be precluded from recovering full damages because of a psychological state resulting from the accident which led him to reject any needed counseling. See Feld v. Merriam, 314 Pa.Super. 414, 461 A.2d 225 (Super.Ct. 1983), rev'd o.g. 506 Pa. 383, 485 A.2d 742 (Sup.Ct. 1984). In Feld the Superior Court stated,
We disagree with Cedarbrook's contention that Samuel Feld is precluded from recovering compensatory damages because he did not mitigate damages by undergoing professional counseling. Where a plaintiff's general rejection of psychiatric treatment is a manifestation of his emotional injuries, as in the instant case, he is not precluded from recovering damages. See, Browning v. United States, 361 F. Supp. 17 (E.D.Pa. 1973). [461 A.2d at 234 n. 12].
See also Annotation, "Duty of injured person to submit to nonsurgical medical treatment to minimize tort damages," supra, 62 A.L.R.3d at 97-98 and supplement thereto.
In essence, defendant did not present sufficient evidence to justify an instruction on Kevin's duty to mitigate, and the undisputed evidence demonstrates sufficient risk incident to the surgery to warrant a reasonable person to decline surgery as a matter of law. Cf. Seaman v. U.S. Steel Corporation, 166 N.J. Super. 467, 475-476 (App.Div. 1979), certif. den., 81 N.J. 282 *316 (1979). We thus reject the obligation to mitigate under the circumstances of this case.
In light of our conclusion that there was no obligation to mitigate damages, we hold that the trial court mistakenly gave an instruction in this case regarding the obligation to mitigate, and we reverse for a new trial. Under the circumstances, we believe it unnecessary to consider any other issue raised by plaintiffs on their appeal.[6]
Reversed and remanded for a new trial.
NOTES
[1] Wehave amended the caption. Jerry Fillmore is identified as a landowner near the scene of the accident. The record before us relates only to proceedings involving defendant New Jersey Bell Telephone Company, and we consider the case as having involved only one defendant.
[2] Kevin was born on July 2, 1966 and was 19 1/2 years of age at the time of trial.
[3] Charles Kisby, III, an Assistant Manager of repair for defendant, testified regarding an inspection of the area of the drop wire he made the day after the accident. He said the drop wire had fallen off the clamps which had fastened it to a span cable so that one end of the wire was connected to a telephone pole and the other end was "hanging down" and "laying down in the grass." Expert testimony indicated that the wire fell because of weathering or abrasion due to the elements in the absence of adequate preventative maintenance. There is no cross-appeal.
[4] We find nothing in the "right to die" cases which overrules Lorenc v. Chemirad, supra and, in any event, consider that case and Robinson v. Jackson, supra, binding upon us.
[5] Dr. Carpiniello's testimony was in depositions. The trial judge prohibited admission into evidence of Dr. Carpiniello's ultimate conclusion that Kevin was not unreasonable in rejecting surgery. Whether or not that ruling was correct, and we do not pass upon it, but see Evid.R. 56, we are satisfied that the risks described by Dr. Carpiniello and, independently, the risks described by Dr. Axilrod together with his recommendations, made Kevin's decision objectively reasonable.
[6] Specifically, although argued by plaintiffs, we do not address the question of enhanced risk damages because the issue was recently addressed by the Supreme Court in Ayers v. Jackson Tp., 106 N.J. 557 (1987).