222 N.J. Super. 108 (1987)
536 A.2d 275
SERGEY SAMOILOV, PLAINTIFF-APPELLANT,
v.
SHARIR RAZ, M.D., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted November 16, 1987.
Decided December 23, 1987.
*109 Before Judges DREIER, BAIME and ASHBEY.
Leifer & Kaplan, attorneys for appellant (Glenn Kaplan and Larry L. Leifer on the brief).
Francis & Berry, attorneys for respondent (Evelyn C. Farkas on the brief).
The opinion of this court was delivered by BAIME, J.A.D.
Plaintiff instituted this medical malpractice action, claiming that defendant, a physician specializing in otolaryngology[1], deviated from professional standards of treatment and committed an assault and battery by intentionally and negligently performing unauthorized surgery. Following a protracted trial, the jury rendered a verdict of no cause of action. On appeal, plaintiff argues that (1) the trial judge erred by refusing to submit the question of assault and battery to the jury, (2) a limiting instruction should have been given concerning the probative effect of the consent form utilized by defendant, and (3) the verdict was against the weight of the evidence. Our thorough review of the record convinces us that these contentions lack merit. We affirm.
*110 The salient facts are as follows. Plaintiff, a chemical engineer, initially visited defendant on November 9, 1982, complaining of recurring pain and a lump slightly below his left ear which had existed for approximately six years. During the physical examination, defendant located a "firm mass" underneath plaintiff's left earlobe, measuring one inch in length. Defendant ordered a sialography, a dye study, of the parotid or salivary gland and x-ray examinations. Defendant testified, and it is essentially undisputed, that it is impossible to determine precisely the location and type of tumor involved without exploratory surgery. Upon receipt of the test results, which confirmed the presence of a mass in the parotid region, defendant recommended surgical removal of the lump. Despite this advice, plaintiff elected not to submit to surgery at that time.
A second visit occurred on December 17, 1982, when plaintiff sought treatment for irritation of his gums and mouth. Concerned with the possibility of a malignancy, defendant again recommended surgery to remove the lump. On this occasion, plaintiff agreed to this procedure. Plaintiff was prescribed an antibiotic and was told to return in two weeks.
On December 31, 1982, plaintiff again visited defendant's office. Defendant confirmed his recommendation of surgery and the two engaged in a lengthy discussion concerning the complications and risks attendant to the procedure. At trial, the testimony of plaintiff and defendant diverged sharply concerning the particulars of their conversation. According to plaintiff, defendant stated that there existed a 30% possibility the tumor was or would become malignant. Defendant allegedly noted that there was some degree of risk plaintiff's facial nerve would be impaired during the course of the surgical procedure, but it was unlikely that serious damage would occur. According to plaintiff, defendant claimed that "[at] the worst" there might result "some kind of cosmetic distortion [to the] face or mouth."
*111 In contrast, defendant testified that he emphasized the possibility of facial nerve damage during the course of each discussion with plaintiff. In that respect, defendant noted that the two had several extensive conversations concerning the matter prior to plaintiff's admission to the hospital. According to defendant, he told plaintiff that there was a distinct possibility of facial nerve damage and that the potential was much higher in the event the tumor was found to be malignant. Defendant also allegedly apprised plaintiff of the consequences of facial nerve damage, noting the impairment that would occur to the mouth, eye and facial muscles.
The subject was further explored when plaintiff was admitted to the hospital. Defendant testified that he again stressed the possibility of damage to the facial nerve. He repeated that the likelihood of impairment was greater if the tumor was found to be malignant. He noted, however, that such damage was possible even if the tumor was benign. According to defendant, he told plaintiff that the "main diagnosis was a benign parotid tumor" but that "something else" might be found during surgery and that "the facial nerve was definitely at risk."
On the eve of surgery, plaintiff signed a consent form which listed as possible complications "bleeding, damage to facial nerve, infection, anesthesia risk." On the consent form, which was admitted into evidence at trial, appeared the phrase "possible resection of facial nerve." Plaintiff maintained, however, that these words were not present on the form when he signed it, although in his subsequent conversations with defendant he never alluded to this fact. He testified that he interpreted the language "damage to facial nerve," which he admitted appeared on the form at the time he executed it, as referring to the remote possibility of damage to several of the nerve branches. According to plaintiff, he consented to resection of the facial nerve only upon a finding of malignancy.
*112 During the surgery the facial nerve was exposed, thus visualizing part of the tumor. Initially, defendant believed that the tumor surrounded the nerve and could be severed from it without consequent damage. In making this attempt, defendant rotated the tumor and then realized that it could not be separated from the nerve. At this point, defendant's impression was that the mass constituted a "muco-epidermoid tumor," possibly a malignancy. Defendant thus resected the nerve and removed the tumor, which was immediately given to a pathologist for a "frozen section." According to defendant, a frozen section generally discloses malignant tissue, but is not as accurate as a complete biopsy, which usually takes three days. Within approximately 20 minutes, the pathology tests were returned to the operating room. These tests revealed that the mass was a neurilemmoma, a benign tumor. Although defendant was relieved by the test results, he nevertheless did not totally discount the possibility of malignancy until the full biopsy was completed.
Although defendant attempted to repair the nerve, his efforts proved unavailing. The left side of plaintiff's face remains paralyzed. At the time of trial, plaintiff was unable to close his left eye, had no "blink reflex" and suffered eating and speech problems.
As we noted at the outset of our opinion, the trial judge refused to include in his instructions a charge on assault and battery. Rather, the case was submitted to the jury on the basis of traditional negligence principles. However, subsumed in the judge's instructions concerning professional standards was an extensive discourse on the concept of consent. While we will later describe the judge's charge in far greater detail, we merely note here the jury was instructed that the performance of a surgical procedure beyond a patient's consent constitutes a deviation from professional standards of care and treatment. Apart from this theory, the judge instructed the jury to return a verdict in plaintiff's favor if they found that defendant either misdiagnosed the nature of plaintiff's condition *113 when he encountered the tumor during surgery, treated the condition too aggressively, used incorrect instruments during the operation or was negligent in his attempt to reconnect the severed nerve.
In its verdict, the jury found that defendant did not deviate from professional standards in his treatment and care of plaintiff. Plaintiff's motion for a new trial was subsequently denied and this appeal followed.

I.
We first consider plaintiff's argument that the trial judge committed reversible error by refusing to instruct the jury on assault and battery. Plaintiff's contention is predicated upon the theory that he never consented to the surgical procedure employed by defendant. The principal thrust of his claim is that he authorized the resection of his facial nerve only in the event the tumor was found to be malignant. As will be explained, we find no merit in the contention that the question of battery should have been presented to the jury.
The seminal New Jersey opinion on this subject is Perna v. Pirozzi, 92 N.J. 446 (1983). There, our Supreme Court stated that "[i]n an action predicated upon a battery, a patient need not prove ... the physician has deviated from a professional standard of care." Id. at 460. Rather, "proof of an unauthorized invasion of the plaintiff's person, even if harmless, entitles him to nominal damages" based upon the theory of assault and battery. Ibid. In that context, "[a]ny non-consensual touching is a battery." Id. at 461. As the Court noted, "[e]ven more private than the decision who may touch one's body is the decision who may cut it open and invade it with hands and instruments." Ibid. Absent an emergency, patients have the right to determine not only whether surgery is to be performed on them, but also the nature and extent of the operation. "A surgeon who operates without the patient's consent engages in the unauthorized touching of another and, *114 thus, commits a battery." Id. at 461-462. The Court emphasized that "[a] nonconsensual operation remains a battery even if performed skillfully and to the benefit of the patient." Id. at 463.
Although these principles have their genesis in the common law, see Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 129-30, 105 N.E. 92, 93 (1914); Prosser, Law of Torts, § 9 at 35 (4 ed. 1971), they have most recently found expression, albeit in a different context, in our Supreme Court's latest decisions concerning the right of the terminally ill to renounce life-sustaining treatment. See, e.g., Matter of Farrell, 108 N.J. 335, 347-348 (1987); Matter of Peter by Johanning, 108 N.J. 365, 372 (1987); Matter of Jobes, 108 N.J. 394, 407 (1987); Matter of Conroy, 98 N.J. 321, 346-347 (1985); In re Quinlan, 70 N.J. 10, 41 (1976), cert. den. sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). Cf. Cannon v. New Jersey Bell Telephone, 219 N.J. Super. 304, 313-314 (App.Div. 1987), certif. den. 109 N.J. 54 (1987); Cheung v. Cunningham, 214 N.J. Super. 649, 653 (App.Div. 1987) (appeal pending). In Matter of Conroy, for example, the Court stated that "[t]he right of a person to control his own body is a basic societal concept...." 98 N.J. at 346. The Court there recognized the patient's right to give an "informed refusal" to medical treatment as the legal correlative of the right to give informed consent. Id. at 347. In Matter of Farrell, the Court reaffirmed the "well-recognized common-law right of self-determination" and established procedures applicable when competent patients who are living at home request the discontinuance of life-sustaining medical treatment. 108 N.J. at 347. In Matter of Peter, the Court molded these procedures to give effect to the wishes of an elderly patient to decline life-support treatment in an institution. 108 N.J. at 377. And in Matter of Jobes, the Court announced new principles to guide "surrogate medical decision [makers]" in determining when and how to seek termination of life-sustaining care. 108 N.J. at 420.
*115 We allude to these precedent-setting, watershed opinions merely to underscore the significance we attach to the valued right of self-determination. "Every human being of adult years and sound mind has a right to determine what shall be done with his own body...." Schloendorff v. Society of New York Hosp., supra, 211 N.Y. at 129-130, 105 N.E. at 93. Closely allied to this concept is the doctrine of informed consent, which "was developed to protect the right to self-determination in matters of medical treatment." Matter of Farrell, supra, 108 N.J. at 347. This doctrine prescribes the "duty of a physician to disclose to a patient information that will enable him to `evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." Perna v. Pirozzi, supra, 92 N.J. at 459, quoting Canterbury v. Spence, 464 F.2d 772, 780 (D.C. Cir.1972), cert. den. 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). Under the doctrine, "the patient who consents to an operation is given the opportunity to show that the surgeon withheld information concerning `the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated.'" Id. at 460, quoting Canterbury v. Spence, 464 F.2d at 787-788.
In this appeal, plaintiff does not challenge the adequacy of the disclosure of information relating to risks inherent in the operation performed. Nor does he contend that he would have decided not to undergo the operation if additional facts had been presented to him. Succinctly stated, he concedes that he consented to an operation to be performed by defendant. Plaintiff contends, however, that the operation defendant performed was not the one to which he consented, and that he authorized resection of his facial nerve only in the event the tumor was found to be malignant. To that extent, the question of informed consent is not raised directly. Nevertheless, we emphasize that plaintiff's claim of assault and battery hinges upon the nature and extent of the information given to him by defendant *116 prior to surgery. Stated somewhat differently, resolution of the question presented depends upon a determination of the metes and bounds of the agreement entered into between plaintiff and defendant and the parameters of the authorization given. Stripped to its essentials, the issue is whether defendant performed an operation which he knew was substantially different from that to which plaintiff had consented.
This question must be considered within its historical context. Prior to the advent of the modern hospital and before anesthesia had appeared on the horizon of the medical world, "the courts formulated and applied a rule in respect to operations which may now be justly considered unreasonable and unrealistic." Kennedy v. Parrott, 243 N.C. 355, 360, 90 S.E.2d 754, 757-758 (Sup.Ct. 1956). It must be borne in mind that when our common law rules were taking shape, surgery, even a major operation, was generally performed in the home of the patient, who ordinarily was conscious, "so that the physician could consult him in respect to conditions which required or made advisable an extension of the operation." Ibid. If the shock of the operation rendered the patient unconscious, immediate members of his family were usually available. Ibid. See also Bennan v. Parsonnet, 83 N.J.L. 20, 24 (Sup.Ct. 1912). Under such circumstances, the courts formulated the rule that any extension of the operation, or change in the surgical procedure initially contemplated, without the consent of the patient or someone authorized to speak for him constituted a battery or trespass for which the physician was liable in damages. Kennedy v. Parrott, supra, 243 N.C. at 360-61, 90 S.E.2d at 758.
As long ago as 1912, however, the fallaciousness of this premise was recognized by our courts. The comments of Justice Garrison in Bennan v. Parsonnet, supra, seem particularly instructive in light of this historical backdrop. There, the old Supreme Court was confronted with a claim of assault and battery where, during surgery, the physician repaired a rupture of the patient's right groin when it had initially been contemplated *117 that the operation would pertain solely to the left groin. In the course of dismissing the claim, Justice Garrison wrote:
The surgical employment of anaesthesia has, as a matter of common knowledge, not only eliminated the possibility of obtaining the patient's consent during the operation, but has also had other radical effects of which notice must be taken. Thus it has rendered possible and of every day occurrence surgical operations of a character and magnitude not dreamed of at the time the common law was in the making and, as a matter of practical moment, has also advanced the period that marks the commencement of a surgical operation from the time when the patient's body is actually invaded by the knife to the time when the anaesthetic is administered or at least when the patient has succumbed to its influence. The employment of anaesthesia has also postponed to this same period of relaxation and unconsciousness the making of that complete and final diagnosis of the patient's condition that at common law was made at a time when he could be both informed and consulted. By these considerations the scope of modern surgical operations has been greatly enlarged and the legal rule applicable thereto extended beyond the emergencies of actual surgery to other matters more or less vitally affecting the patient's welfare. To meet these changed conditions the rule of law must, in the interest alike of the patient and surgeon, be adapted to the changes that have been so wrought, chief among which is the unconscious state of the patient at a time when by the common law rule his consent must be obtained. [Id. 83 N.J.L. at 23-24].
* * * * * * * *
The conclusion therefore to which we are led is that when a person has selected a surgeon to operate upon him ... the law will by implication constitute such surgeon the representative pro hac vice of his patient and will, within the scope to which such implication applies, cast upon him the responsibility of so acting in the interest of his patient that the latter shall receive the full benefit of that professional judgment and skill to which he is legally entitled.
Such implication affords no license to the surgeon to operate upon a patient against his will or by subterfuge, or to perform upon him any operation of a sort different from that to which he had consented, or that involved risks and results of a kind not contemplated. As to such matters the rule in question submits nothing to the judgment of the surgeon, who as the implied representative of his patient can under such implication truly represent him only in so far as he gives to him the benefit of his professional wisdom within the general lines of the curative treatment agreed upon between them.... Within such general lines, however, much is necessarily left to the good judgment of the operating surgeon, just how much will depend upon the circumstances of the individual case. [Id. at 25-26].
In a variety of factual settings, these considerations have been echoed by the courts of other jurisdictions. See, e.g., Moser v. Stallings, 387 N.W.2d 599 (Iowa Sup.Ct. 1986); Perin v. Hayne, 210 N.W.2d 609 (Iowa Sup.Ct. 1973); Woolley v. *118 Henderson, 418 A.2d 1123 (Me.Sup.Jud.Ct. 1980); Kennedy v. Parrott, supra. These courts have rejected what one has characterized as the "shopworn doctrine that would impose liability for a battery on physicians whose treatment deviated from that agreed to, however slight the deviation and regardless of the reasonableness of the physician's conduct." Woolley v. Henderson, supra, 418 A.2d at 1133. In that context, the strict common law rule has been criticized as "plac[ing] form over substance [and] elevat[ing] what is essentially a negligence action to the status of an intentional tort based on the fortuity that touching is a necessary incident to treatment in a relationship which is consensual in nature." Ibid. See also Perin v. Hayne, supra, 210 N.W.2d at 617-618; Kennedy v. Parrott, supra, 243 N.C. at 361-62, 90 S.E.2d at 759. While refusing to abrogate the common law assault and battery rule, these courts have adopted the principle that "when an undisclosed potential complication results, the occurrence of which was not an integral part of the treatment procedure but merely a known risk," the conduct of the physician should not be considered a battery, but rather should be judged in accordance with traditional negligence principles relating to informed consent. Perin v. Hayne, supra, 210 N.W.2d at 617.
Although this approach has not achieved universal support, see, e.g., Wall v. Brim, 138 F.2d 478 (5 Cir.1943); Cathemer v. Hunter, 27 Ariz. App. 780, 558 P.2d 975 (App.Ct. 1976); Mims v. Boland, 110 Ga. App. 477, 138 S.E.2d 902 (App.Ct. 1964); Karl J. Pizzalotto M.D., Ltd. v. Wilson, 437 So.2d 859 (La.Sup.Ct. 1983); Beck v. Lovell, 361 So.2d 245 (La. App.Ct. 1978), writ den. 362 So.2d 802 (La.Sup.Ct. 1978); Rogers v. Lumbermen's Mutual Casualty Company, 119 So.2d 649 (La. App.Ct. 1960); Kinikin v. Heupel, 305 N.W.2d 589 (Minn.Sup.Ct. 1981); Gerety v. Demers, 92 N.M. 396, 589 P.2d 180 (Sup.Ct. 1978); Suskey v. Davidoff, 2 Wis.2d 503, 87 N.W.2d 306 (Sup.Ct. 1958), it has been described by Dean Prosser as the "prevailing view," Prosser, Law of Torts, supra, at 165-166, and has been well *119 received in scholarly journals. See, e.g., Comment, "Informed Consent in Medical Malpractice," 55 Cal.L.Rev. 1396 (1967).
We agree with the majority trend. We would be short on realism were we not to recognize that in major internal operations the exact condition of the patient cannot be finally and definitely diagnosed until after the patient has been anesthetised and the incision has been made. Kennedy v. Parrott, supra, 243 N.C. at 361-62, 90 S.E.2d at 759. Unexpected events may arise in the course of the operation and incidental thereto which should generally be met according to the best judgment and skill of the surgeon.
We are convinced that the battery theory should be reserved for those instances where the patient consented to the performance of one kind of operation and the physician performed a substantially different one for which authorization was not obtained. Ordinarily, a surgeon is justified in believing that his patient has assented to such operations as approved surgery demands to relieve the affliction from which the patient is suffering. In such case, the consent  in the absence of proof to the contrary  should be construed as general in nature and the surgeon may employ such surgical techniques as he, in the exercise of his sound professional judgment, determines are reasonably necessary to treat the patient's condition. When the patient consents to certain treatment and the doctor undertakes that course, but an undisclosed complication with a low probability occurs, and the physician utilizes appropriate surgical procedures to remedy the condition, we perceive no intentional deviation from the consent given and, therefore, no basis for a claim of assault and battery. That does not foreclose a plaintiff from claiming that the physician was negligent in failing to apprise the patient of the possible risks attendant to the operation. However, he may not properly contend that the doctor committed an intentional tort, an assault and battery.
The simple and overriding fact is that in many instances a surgical operation cannot be contracted for or performed *120 according to preordained plans and specifications. Public policy thus demands that the law, within reasonable limits, grant the surgeon sufficient freedom to fulfill his assigned mission. To that extent, absent proof to the contrary, the consent given, express or implied, should be construed to authorize the physician to employ surgical procedures which, in his professional judgment, are reasonably necessary to remedy his patient's condition.
Applying that standard, we are in accord with the judge's determination that there was no justifiable basis to submit the question of assault and battery to the jury. It is undisputed that defendant apprised plaintiff of the possibility of facial nerve damage. The essential purpose of the surgery was to remove the tumor located in the parotid region of plaintiff's face and to that extent the facial nerve was at risk. Although it is also uncontradicted that plaintiff was told the probability of impairment was enhanced if the tumor was found to be malignant, his interpretation of the consent given by him as barring resection if the tumor was benign is belied by the evidence presented.
Of course, we recognize that, at least in a technical sense, discovery that the tumor surrounded or encased the facial nerve did not present a life-threatening emergency. It was possible for defendant to abort the operation upon learning of the exact location of the tumor. We note, however, that such a course would not have been without risks. In any event, it cannot fairly be said, based upon the record, that the operation performed by defendant was of a different sort from that to which plaintiff consented. Therefore, only a negligence issue was raised as to whether defendant should have proceeded as he did. As we have noted, that issue was fairly presented to the jury. See Skripek v. Bergamo, 200 N.J. Super. 620, 630 (App.Div. 1985), certif. den. 102 N.J. 303 (1985); P. v. Portadin, 179 N.J. Super. 465, 472 (App.Div. 1981)

*121 II.
In this context, we have carefully reviewed the instructions given to the jury and find no error in that respect. Indeed, perhaps it can be said that the judge's charge was overly favorable to plaintiff.
Although the judge refused to submit the question of battery to the jury, he charged that "the failure of defendant to obtain consent to the actual procedure performed, [depending on the circumstances, would] constitute a deviation from accepted practice." The jury was told to consider "all of the evidence [bearing] on this subject, including ... the consent form [and] the conversations, discussions and agreements, if any, between the parties...." The jury was further advised that "[i]t is a deviation from accepted medical standard[s] to perform an operation that was not consented to," and that resolution of the question depended upon the "scope of the consent given."
In short, we perceive nothing in the judge's instructions warranting a reversal.

III.
Plaintiff's remaining arguments are clearly without merit and do not require extended discussion. R. 2:11-3(e)(1)(E). Specifically, we conclude that the judge's refusal to give a limiting instruction concerning the probative effect of the consent form signed by plaintiff did not contravene the mandate of Evid.R. 6. Contrary to plaintiff's assertion, the consent form does not purport to exculpate a physician from the consequences of his malpractice. Nor can it be so interpreted.
We also find that the jury's verdict was not against the weight of the evidence. The jury could reasonably have found from the evidence presented that defendant did not deviate from accepted professional standards of treatment and that the surgical procedure performed fell within the purview of the express and implied consent given.
Accordingly, the judgment of the Law Division is affirmed.
NOTES
[1] The branch of medicine or surgery which deals with the diseases of the ear, the nose, and the throat and larnyx. 3 Schmidt, Attorney's Dictionary of Medicine (1986), at 77.