WILSON, J.,
DISSENTING:
¶37. Under Mississippi law, a patient may assert two types of “consent” claims against a physician. First, “a surgeon who performs an operation without his patient’s consent commits an assault [and battery] for which he is liable for damages.” Fox v. Smith, 594 So.2d 596, 604 (Miss.1992), Second, even if the physician obtains the patient’s consent in fact, the physician may still be liable if that consent was not “informed.” Jamison v. Kilgore, 903 So.2d 45, 49-50 (¶ 15) (Miss.2005). For consent to be informed, the patient must be advised of the material and “known risks of the procedure.” Id. at 50 (¶ 17) (emphasis added).
¶38. The Dodds’ claim is a no-consent claim, not an informed-consent claim. Logically, it cannot be an informed-consent claim because the injury about which they complain—the removal of Lacy’s ovaries— was not a risk of the procedures tb which she admits she consented. The removal of her ovaries was not an “undesirable symptom or condition” caused by the procedures to which she consented, id. nor was it a response to complications of those procedures. It was a different procedure (a bilateral salpingo-oophorectomy) that Dr. Hines deemed necessary and performed once he found that Lacy’s ovaries appeared to be cancerous. The only issue in this case is whether Lacy consented to that procedure in fact.
¶ 39. Whether Lacy gave consent turns on whether the procedure was covered by the following provision of the consent agreement that she signed:
I further consent and authorize the performance of such additional surgeries and procedures (whether or not arising from presently unforseen conditions) considered necessary or emergent in the judgment of my doctor or those of the hospital’s medical staff who serve me.
¶40.-The undisputed material facts establish that Lacy’s -bilateral salpingo-ooph-orectomy was covered by her consent. Dr. Dodd was treating Lacy for infertility, a history of ovarian cysts, and pelvic pain. After other treatments were unsuccessful, Lacy consented to a laparoscopy with an ovarian cystectomy and a possible salpin-gectomy (removal of a fallopian tube). In the course her surgery, Dr. Hines found that both of Lacy’s ovaries had an “extremely abnormal appearance” and “appeared to be cancerous.” Dr. Hines knew that Lacy “had a family, history of ovarian cancer, which is a disease with a high mortality rate.” Dr. Hines therefore asked for an intraoperative consult with Dr. Seago, a gynecologic oncologist. Dr. Seago examined Lacy and concurred that both ovaries appeared cancerous'. Dr. Seago and Dr. Hines agreed that “removal of the ovaries- -was necessary for [Lacy’s] long-term health” and “in [her] best interest.” The tumors that they observed had “taken *134 over both ovaries to such an extent that normal ovarian tissue was essentially unrecognizable.” For this reason, they concluded that “the likelihood that [Lacy] would ever have a child from one of her own eggs was practically nonexistent.”[17] Therefore, based on his professional judgment as a gynecologic oncologist, Dr. Seago recommended the removal of Lacy’s ovaries. And, exercising his professional judgment, Dr. Hines concurred and performed the procedure.
’ ¶ 41. Although Lacy now maintains that her doctors could have taken a biopsy and awaited the results rather than removing her ovaries, neither doctor considered that to be appropriate medical care under the circumstances. Both explained that ■ they believed that a biopsy would have risked spreading the cancer that they believed existed and reduced Lacy’s chances of survival. Furthermore, a biopsy could not have ruled out .cancer definitively, and in the doctors’ judgment, even non-cancerous lesions such as those covering Lacy’s ovaries would have been a continuing health risk because they “can degenerate into cancer if not removed.” Thus, a biopsy would have been contrary to Dr. Hines’s and Dr. Seago’s medical judgment.
¶ 42. Based on these undisputed facts, there is no question that Dr. Hines performed a procedure that he and Dr. Seago “considered necessary ... in [their] judgment.” There is no evidence or suggestion that their stated reasons for performing the procedure were pretextual and that they actually removed Lacy’s ovaries for some other reason. Nor is there any basis for speculating that a doctor whose practice is dedicated to treating infertility would undertake such a procedure against his own best judgment. The majority asserts that the “[d]etermination of whether the procedure would be necessary or emergent should require expert testimony,” and the majority apparently believes that it was the doctors’ burden to come forward with such testimony. Ante at (¶ 21). But this simply rewrites the actual terms of Lacy’s consent. Lacy expressly consented to “such additional procedures ... considered necessary ... in the judgment of [Dr. Hines] or [Dr. Seago]” (emphasis added). The affidavits of Dr. Hines and Dr. Seago establish that they considered the procedure necessary in their medical judgment. They do not need an expert to testify about what they considered necessary in their own judgment. Therefore, based on the terms of the consent agreement that Lacy signed, there is no genuine issue of material fact as to whether she consented to the procedure. She did, and the defendants are entitled to judgment as a matter of law.
¶43. Rather than simply applying the terms of Lacy’s consent agreement to the undisputed facts, the majority cites Barner v. Gorman, 605 So.2d 805, 808 (Miss.1992), for the proposition that a consent form is only evidence of a patient’s consent and is not conclusive. However, Earner was an informed-consent case, and the Court held only that the form’s general statement that the risks of a procedure had been explained, to the patient was not conclusive given the patient’s testimony that a specific risk was never explained. See id. at 806-08. The Court did not hold that the form was anything less than conclusive as to whether .the patient had consented in fact—only that it was not dispositive as to whether her consent was informed. As discussed above, this case involves a no-consent claim, not an informed-consent claim, so Burner is inapposite. Lacy’s signed consent demonstrates that she consented in fact to additional procedures deemed nec *135 essary in her doctor’s medical judgment, and the circuit court properly granted summary judgment.
¶ 44. By refusing to enforce Lacy’s consent agreement, the majority effectively holds that such an agreement—i.e., one in which a patient gives preoperative consent to additional procedures deemed necessary in his or her doctor’s judgment—is void as against public policy. This becomes clear when the majority declares that Lacy’s consent was ineffective because Dr. Hines performed a procedure that, in the majority’s estimation, was “substantially different” than the procedures originally contemplated. Ante at (¶ 24) (quoting Samoilov v. Raz, 222 N.J.Super. 108, 536 A.2d 275, 280-81 (1987)). The New Jersey case from which the majority borrows this standard articulated a common law rule of construction—a default rule—that when a “patient consented to the performance of one kind of operation,” her consent will be understood, “in the absence of proof to the contrary,” to extend to such other procedures as her physician, “in the exercise of sound professional judgment, determines are reasonably necessary to treat [her] condition.” Samoilov, 536 A.2d at 280-81. Apparently, the . majority has transformed this default rule of New Jersey common law into a mandatory limitation on every medical consent form signed in the State of Mississippi. In effect, the majority declares that any consent that is not so limited is void as against public policy.
¶ 45. The actual terms of Lacy’s consent contain no such limitation. Lacy authorized her doctor to perform such additional procedures as he concluded, in the course of surgery, were necessary in his medical judgment—not just procedures deemed “substantially” similar in hindsight by lawyers. The procedure at issue was covered by Lacy’s consent, as Dr. Hines not only relied on his- own judgment but also took the added precaution of an intraoperative consult with a subject matter expert. Clearly, the majority disapproves of the breadth of Lacy’s preoperative consent, but that is not a basis for invalidating it. See Estate of Reaves v. Owen, 744 So.2d 799, 802 (¶ 9) (Miss.Ct.App.1999) (“The function of the courts is to enforce contracts rather than enable parties to escape their obligation upon the pretext of public policy.” (quoting Smith v. Simon, 224 So.2d 565, 566 (Miss.1969))). Whether a patient should be able to grant such consent to his .or her physician prior to an operation is an issue on which reasonable minds may differ. But in the absence of a clear public policy prohibiting such an agreement, we should enforce the consent to surgery, which Lacy signed voluntarily, according to its terms. See Barbour v. State ex rel. Hood, 974 So.2d 232, 244 n. 19 (Miss.2008) (“Our constitutional duty ... is to apply the law, and leave matters of public policy to the other branches.”).
¶ 46. In addition to my basic disagreement with the majority’s view of this case, I fear that the majority opinion leaves the status of the Dodds’ claim unclear. At one point, the majority seéms to conclude that the Dodds’' claim is a no-consent claim because it would be “illogical” to treat it as an informed-consent claim (see ante at (¶¶ 15-17)), which is my own conclusion. Yet in the' next sections, the majority seems to imply that the Dodds may pursue an informed-consent claim on remand if they obtain expert testimony to support it. See ante at (¶¶ 18-20, 23). A clear holding-on this issue is necessary to guide the circuit court and the parties on remand. In addition, the majority seems to indicate at one point that Lacy’s consent is “evidence of [her] consent to the procedures done,” just not “conclusive evidence.” Ante at (¶ 22). This suggests that whether Lacy consented to the procedure remains a: gen *136 uine. issue of fact to be litigated, on remand. Yet in the next section, the majority states that “[cjlearly, Lacy did not expressly authorize the removal of her ovaries.” Ante at (¶ 24) (emphasis added). This, implies that , the majority has concluded' that Lacy is entitled to judgment as a-matter of law on her no-conseñt (i.e., battery) claim. The Court’s holding on this issue should also be clarified for the circuit court and the parties. •
¶ 47. For the foregoing reasons, I would affirm the circuit court’s order granting summary judgment in favor of’ all defendant's. Accordingly, I respectfully dissent.[18]
GRIFFIS, P.J., AND CARLTON, J., JOIN THIS OPINION,

. Lacy subsequently carried and gave birth to two children from donor eggs.

. I, agree with parts of Judge Carlton's dissent; however, like the circuit court, I would not rely on the Dodds' lack of expert testimony as a basis for granting summary judgment, While issues of causation or lack of expert testimony may eventually prove dispositive on remand, I cannot help but conclude that the circuit court’s orders in this case were intended to—or at least were reasonably interpreted to—hold those issues in abeyance.